**UNITED STATES of America,**
**Plaintiff,**

v.

**NATIONAL SOCIETY OF PROFESSION-**
**AL ENGINEERS, Defendant.**

**Civ. A. No. 2412–72.**

United States District Court,
District of Columbia,
Civil Division.

Dec. 19, 1974.

Findings of Fact Dec. 31, 1974.

Richard J. Favretto, Dept. of Justice, Washington, D. C., for plaintiff.

Lee Loevinger, E. Barrett Prettyman, Jr., Hogan & Hartson, Milton F. Lunch, Washington, D. C., for defendant.

## OPINION

JOHN LEWIS SMITH, Jr., District Judge.

This is an antitrust suit brought by the United States against the National Society of Professional Engineers (NSPE) under § 1 of the Sherman Act, 15 U.S.C. § 1, which declares illegal every "contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States. . . ." The alleged offense centers on Section 11(c) of defendant's Code of Ethics which prohibits members of NSPE from submitting competitive bids for their engineering services.[1] Plaintiff seeks to enjoin the combination and conspiracy which maintains the prohibition against competitive bidding as well as to have canceled all provisions to the Code of Ethics and other relevant rules or statements of policy which support the bidding ban.

NSPE is a professional society incorporated under the laws of South Carolina with more than 69,000 members located throughout the United States. Membership in NSPE accounts for slightly less than 10 percent of all graduate engineers in the nation holding a collegiate degree in engineering from an institution of higher learning. Upon a demonstration of proficiency, each of the states permits engineers to hold a certificate of registration or license to practice. Approximately 325,000 are so registered of whom 55,000 or 17 percent, are members of NSPE. About half of the registered professional engineers in this country are engaged in offering services to the public as consulting engineers. Although NSPE is a national organization, it is affiliated with professional engineering societies in each of the 50 states, territories and the District of Columbia. When a member joins NSPE, he joins the applicable state society and local chapter at the same time.

Defendant's Board of Directors adopted the present format of the NSPE Code of Ethics in 1964. Section 11(c) of the Code provides that an engineer "shall not solicit or submit engineering proposals on the basis of competitive bidding." The section defines competitive bidding as any measure of compensation

---

1. Section 11(c) provides:

Section 11—The Engineer will not compete unfairly with another engineer by attempting to obtain employment or advancement or professional engagements by competitive bidding . . . .

c. He shall not solicit or submit engineering proposals on the basis of competitive bidding. Competitive bidding for professional engineering services is defined as the formal or informal submission, or receipt, or verbal or written estimates of cost or proposals in terms of dollars, man days of work required, percentage of construction cost, or any other measure of compensation whereby the prospective client may compare engineering services on a price basis prior to the time that one engineer, or one engineering organization, has been selected for negotiations. The disclosure of recommended fee schedules prepared by various engineering societies is not considered to constitute competitive bidding. An Engineer requested to submit a fee proposal or bid prior to the selection of an engineer or firm subject to the negotiation of a satisfactory contract, shall attempt to have the procedure changed to conform to ethical practices, but if not successful he shall withdraw from consideration for the proposed work. These principles shall be applied by the Engineer in obtaining the services of other professionals.

"whereby the prospective client may compare engineering services on a price basis prior to the time that one engineer . . . has been selected for negotiations." While Sec. 11(c) advises that disclosure of a recommended state society fee schedule does not constitute competitive bidding, it requires that the engineer "withdraw from consideration for the proposed work" if the prospective client insists on competitive bidding.

In practice, adherence to Sec. 11(c) by the engineer and client means the prospective client will limit his initial search to the engineer whose background and reputation suggests he is the best qualified and most appropriate for the client's needs. Discussion of fees, however, will not be permitted until after the client has actually selected an engineer and discussed the scope of his particular problem. Should the engineer and client be unable to agree upon a satisfactory fee arrangement, the client will withdraw his selection and approach a new engineer. This procedure is known as the traditional method of retaining professional engineering services.

In addition to the Code of Ethics, the defendant has sought to promote its ban on competitive bidding by a variety of other means. These include publication of professional policy statements, issuance of opinions on a case analysis basis by its Board of Ethical Review, distribution of pamphlets to members and clients, personal letters to individual clients suspected of soliciting on a competitive bid basis, and participation with other professional societies in preventing governmental agencies from obtaining price proposals for architect-engineering (A–E) projects by competitive bidding methods.

While NSPE has no authority to terminate an engineer's membership in his state society for unethical conduct, it has played a significant role in coordinating and encouraging state society investigations into suspected misconduct. NSPE has recommended procedures to be followed by state societies upon the filing of charges of unethical

conduct against a member, assisted in the conduct of these investigations, and directly warned members of apparent Sec. 11(c) violations.

The policing actions of defendant with respect to Sec. 11(c) have met with apparent success. The record is devoid of any evidence suggesting significant defections by members from the bidding ban. Attempts by at least one federal agency to exchange the traditional method of procuring A–E services for competitive bidding met strong resistance resulting in part from actions of NSPE urging its members to refuse to offer their services.

The nature of engineering services provided by NSPE members covers a wide spectrum embracing the study, design and construction of real property improvements located throughout the United States and abroad. Engineering services include pre-feasibility studies, feasibility studies, planning, preliminary studies, the preparation of drawings, plans, designs, specifications, cost estimates, manuals, and reports, consultations, surveys, and inspections. This work is performed in connection with myriad projects ranging from highway construction, public utilities and communications facilities to commercial structures, transportation means and mining facilities. The list is virtually endless. The clients for whom NSPE members offer their services include governmental agencies at all levels, manufacturing companies, industrial companies and retailing companies operating throughout the United States.

NSPE members practice as sole practitioners, partnerships and corporations ranging upwards in size to 1500 individuals. Individual members are often licensed to perform engineering services in several states at one time. Engineering firms with which NSPE members are affiliated frequently maintain offices in states and foreign countries other than their principal places of business. Such firms perform services on a multi-state, regional or national basis.

Most design and construction projects require the services of both architects and engineers whose services are often provided by a single firm. The engineer's portion of the firm's fee normally accounts for about 5 to 6 percent of the cost of construction. For the year 1972, the 438 largest A–E design firms accounted for approximately $2.2 billion in fees. Profit margins for many firms range as high as 10 to 12 percent. Forty, or approximately 9 percent, of the top 438 A–E design firms were publicly held corporations or affiliated with publicly held corporations, whose fees accounted for approximately 14 percent of the receipts from this group.

In addition to A–E design firms, there is a second significant group of firms performing engineering services known as design/construct firms which differ from typical consulting engineering firms in their added capability of performing construction work as well as traditional A–E design work. In 1972, 30, or approximately 48 percent, of the top 62 design/construct firms in the nation were publicly held corporations or affiliated with such corporations and accounted for 65 percent of the $26 billion of new project contracts awarded this group.

The Government attacks defendant's ethical prohibition against competitive bidding on grounds it constitutes price fixing in *per se* violation of § 1 of the Sherman Act. Claiming that Sec. 11(c) operates to deny clients access to competitive price information, plaintiff contends the bidding ban illegally tampers with the price structure of engineering services by eliminating all forms of price competition, thereby stabilizing engineering fees. NSPE proffers a three pronged defense contending first, the practice of professional engineering is not trade or commerce within the scope of § 1; second, the ethical prohibition is a reasonable practice in the field of professional engineering; third, the practice of professional engineering is exempt from antitrust attack because it is a state regulated profession. The Court will consider these defenses *seriatim*.

I

Defendant claims that the practice of professional engineering falls outside the ambit of trade or commerce because it is a so-called "learned profession" governed by self-regulation. The notion that learned professions are not covered by the Sherman Act has its genesis in the construction placed upon the term "restraint of trade" under § 3 of the Sherman Act by the Supreme Court in Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 436, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). In giving expansion to the word "trade", the Court quoted with approval from now famous dictum set down by Mr. Justice Story in The Schooner Nymph, 1 Sumn. 516, 517–518, 18 Fed.Cas. pp. 506, 507, No. 10,388 (1834):

> "Whenever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, not in the liberal arts or in the learned professions, it is constantly called a trade."

Notwithstanding this favorable reference to an early nineteenth century conception of trade, the Supreme Court has never held that a learned profession is exempt from the Sherman Act and has in fact affirmed its intention not to "intimate an opinion on the correctness of the application of the term [trade] to the professions." United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 491–2, 70 S.Ct. 711, 715, 94 L.Ed. 1007 (1950).[2] The only circuit

---

**2.** Two cases are generally cited as authority for the learned profession exemption: Federal Baseball Club, Inc. v. National League of Professional Baseball Clubs, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922), where the Supreme Court noted that "personal effort, not related to production, is not a subject of commerce." *Id.* at 209, 42 S.Ct. at 466; FTC v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931), where the Court stated that "medical practitioners . . . are not in competition with respondent.

court to declare a learned profession exemption was the Fourth Circuit in Goldfarb v. Virginia State Bar, 497 F.2d 1 (1974), cert. granted, 419 U.S. 963, 95 S.Ct. 223, 42 L.Ed.2d 178 (1974). In that case, a divided court held that a legal profession's fee schedule was immune from a § 1 attack because of the applicability of the "learned profession exemption." *Id.* at 15. More recently, however, a federal district court, after giving careful consideration to the entire litany of learned profession cases, arrived at an opposite conclusion finding that the "fee schedule activities of the defendant, Oregon State Bar, are not immune to Sherman Act attack . . by the 'learned profession' exemption." United States v. Oregon State Bar, 385 F.Supp. 507 (D.C.Or.1974).

■ The concept of a learned profession exception to the antitrust laws is of dubious validity in view of the repeated reluctance of federal courts to recognize it as a legitimate exception to the Sherman Act. The issue of whether a profession is a learned one is not seen by the Court as the appropriate approach for resolving the higher question of whether the Sherman Act is applicable to that profession. To engage in such an inquiry would chart the Court on a semantic adventure of questionable value. It would be a dangerous form of elitism, indeed, to dole out exemptions to our antitrust laws merely on the basis of the educational level needed to practice a given profession, or for that matter, the impact which the profession has on society's health and welfare. Clearly, the more appropriate and fairer course is to examine the nature and conduct involved in the profession on a case by case basis together with the context in which it is practiced.

■ Congressional intent behind the Sherman Act focused on a desire to prevent restraints to "free competition in

business and commercial transactions which tended to · . . . raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services . . . ." Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940). The types of business and commercial transactions which Congress intended the Sherman Act to protect have generally been accorded broad recognition by the courts. United States v. National Ass'n of Real Estate Boards, *supra* (business of real estate broker is trade within the meaning of § 3 of the Sherman Act); United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) (business of insurance not exempt from operation of the Sherman Act); American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943) (group health organization engaged in obtaining medical services for its members is conducting trade under § 3 of the Sherman Act). Each of these cases has turned on the character of the restraint and the activity restrained as opposed to a litmus test based on professionality. *Cf.* Apex Hosiery, *supra,* 310 U.S. at 485, 60 S.Ct. 982. In view of this approach taken by the courts, it can be said at the very least that where the activity of a profession so directly impacts upon interstate trade and commerce as to substantially contribute to the latter's character and direction, it must be concluded that the profession's activity has become subsumed within the general scope of § 1 of the Sherman Act regardless of whether the profession may be characterized as a learned one. As the Supreme Court noted in *South-Eastern Underwriters, supra,* with reference to the language of §§ 1 and 2 of the Sherman Act:

"Language more comprehensive is difficult to conceive. On its face it

They follow a profession not a trade . . .." *Id.* at 653, 51 S.Ct. at 592. Both references to learned professions are dicta and not considered to be a holding by the Court of the existence of a learned profession exemption to the Sherman Act.

For a discussion of these cases as precedent for a learned profession exemption, see the opinion of Judge Craven (dissenting in part) in Goldfarb v. Virginia State Bar, 497 F.2d 1, 23–24 (4th Cir. 1974), cert. granted, 419 U.S. 963, 95 S.Ct. 223, 42 L.Ed.2d 178 (1974).

shows a carefully studied attempt to bring within the Act every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states." 322 U.S. at 553, 64 S.Ct. at 1174.

■ The record amply demonstrates that professional engineering is not a metaphysical pursuit but rather a conduit through which abstract scientific principles are reduced to a level of practical application in response to a given problem. In this sense, professional engineering offers a service. And with respect to design engineers who prepare plans and specifications for real property improvements and articles of manufacture, professional engineering also offers a product. Unlike the lawyer's brief or the scholar's text which convey thought, an engineer's blueprints constitute a necessary physical tool which when combined with standardized techniques of manufacturing and construction, yield a final, functional reduction to practice. In this regard, professional engineering enjoys a maximum interface with end products of construction and manufacture.

The business nature of professional engineering firms is clearly established in the record. It is an industry often organized on a local, regional, national and even international scale controlling, guiding and shaping the pace and direction of the vast array of interstate transactions needed to carry out much of the nation's construction and manufacture. Fully 50 to 80 percent of the cost of constructing and equipping construction projects is controlled by an engineer's work. A substantial amount of equipment and material is transported in interstate commerce at the specific direction of NSPE members. It would not be hyperbole to observe that professional engineering services are at the very backbone of the major portion of the nation's commerce. This is not a case of indirect and insubstantial impact by a so-called learned profession upon interstate commerce. The record is impressive in demonstrating that the im-

print of professional engineering upon interstate commerce is clear and unmistakable. It is a driving force of seminal character which continues to forge the very foundation from which our commercial trade emanates. The Court is satisfied in light of the well documented record that the activities of NSPE and its members fall well within the scope of § 1 of the Sherman Act.

## II

■ It is undisputed that price fixing is a *per se* unreasonable restraint of trade under the Sherman Act and that in such cases it is not for the court to decide whether a particular price fixing activity serves an honorable or worthy end. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. National Ass'n of Real Estate Boards, *supra*, 339 U.S. at 489, 70 S.Ct. 711; United States v. South-Eastern Underwriters Ass'n, *supra*, 322 U.S. at 561, 64 S.Ct. 1162. Hence, if the Sec. 11(c) ban on competitive bidding acts to fix the prices of engineering services, the Court's inquiry is ended and it need not consider the reasonableness of the ethical proscription.

■ ■ In order for conduct to be characterized as price-fixing, it is not necessary to show that the alleged combination or conspiracy has actually pegged prices at a particular level. Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). It need only be established that the suspect conduct acts to restrain free price movement. It is the act of tampering with the price structure which is at the core of the offense. As the Court in *Socony-Vacuum* noted:

"Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they . . . stabilized prices they would be directly in-

terfering with the free play of market forces." 310 U.S. at 221, 60 S.Ct. at 843.

Accordingly, where the application and practice of a code of professional ethics leaves members of a professional association genuinely free in their pricing decisions, no § 1 offense arises.

Section 11(c) prohibits defendant's members from engaging in any form of price competition when offering their services; selection is restricted to considerations of reputation and ability. No fee information may be given a prospective client which takes the form of cost estimates or other proposals in terms of dollars, man days of work required, or percentage of construction cost which can be compared to that of another engineer. Section 11(c), however, does permit members to disclose recommended state society fee schedules to prospective clients in the course of the selection process. Moreover, Sec. 9(b) of defendant's Code of Ethics requires its members not to accept work at a fee "below the accepted standards of the profession in the area." [3] As a result of these sections, the only price information available for input into the client's selection equation is a uniformly regular fee schedule. Should the client persist in requiring competitive bids, Sec. 11(c) requires the engineer to withdraw the offer of his service altogether.

■ Although the actual implementation and enforcement of Sec. 11(c) is not critical to a determination of whether a combination or conspiracy exists to restrain trade, *Socony-Vacuum, supra,* 310 U.S. at 225, n. 59, 60 S.Ct. 811, the record does support a finding that NSPE and its members actively pursue a course of policing adherence to the competitive bid ban through direct and indirect communication with members and prospective clients. As noted *supra,* NSPE has engaged in educational campaigns and personal admonitions to members and clients who were suspected of engaging in competitive bidding practices.

■■ Upon careful review of the pertinent authorities, the Court is convinced that the ethical prohibition against competitive bidding is on its face a tampering with the price structure of engineering fees in violation of § 1 of the Sherman Act. It is not important to know what effect the Sec. 11(c) prohibition has on the price of professional engineering services. Kiefer-Stewart Co. v. Seagram & Sons, *supra,* 340 U.S. at 213, 71 S.Ct. 259. What is of critical significance is that the agreement among defendant's members to refrain from competitive bidding is an agreement to restrict the free play of market forces from determining price; to sacrifice freedom in pricing decisions to market stability. The combination becomes a *per se* illegal one under § 1 of the Act when it tends to "cripple the freedom of traders and thereby restrain[s] their ability to sell in accordance with their own judgment." *Kiefer-Stewart, ibid.* By proscribing competitive bidding, Sec. 11(c) has as its purpose and effect the excision of price considerations from the competitive arena of engineering services. The ban narrows competition to factors based on reputation, ability, and a fixed range of uniform prices. The prospective client is thus forced to make his selection without all relevant market information. The Sec. 11(c) ban on competitive bidding is in every respect a classic example of price-fixing in violation of § 1 of the Sherman Act.

### III

■ Action to regulate trade undertaken by state officials pursuant to state legislative command is not governed by the Sherman Act. Parker v. Brown, 317

---

3. The Sherman Act offenses alleged in the Complaint do not specify activities involving the use of fee schedules by defendant and accordingly the Court does not consider their legality to be at issue in this case. The Court does believe, however, that insofar as the use of fee schedules by defendant's members might affect the impact which Sec. 11(c) has on trade and commerce, an inquiry into their promotion and enforcement by defendant is plainly relevant.

U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker,* a producer and packer of raisins challenged a California law which authorized the establishment, through state officials, of marketing programs for state produced agricultural products. The purpose of the legislation was to stabilize prices by restricting competition in order to "conserve the agricultural wealth of the State" and "prevent economic waste in the marketing of agricultural products." *Id.* at 346, 63 S.Ct. at 311. The Court in *Parker* held:

> "We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." *Id.* at 350–51, 63 S.Ct. at 313.

Defendant has cited statutes in 16 states which prohibit fee bidding by engineers. It is defendant's position that because Sec. 11(c) coincides with state law, the *Parker* doctrine of state action immunity shields defendant from Sherman Act liability. The Court finds this extension of *Parker* unacceptable for several reasons.

The state program in *Parker* comprised a carefully legislated administrative plan for trade regulation which insured continuous state supervision through the offices of a state created commission. It was not a case where agricultural growers had been allowed to restrain trade in contravention of the antitrust laws by mere legislative fiat. The Court emphasized this point by noting:

> "[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful . . . ." *Id.* at 351, 63 S.Ct. at 314.

Likewise, the First Circuit observed in George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, cert. denied, 400 U.S. 850, 91 S.Ct. 54, 27 L. Ed.2d 88 (1970):

> "The [*Parker*] Court's emphasis on the extent of the state's involvement precludes the facile conclusion that ac-

tion by any public official automatically confers exemption. . . . Our reading of *Parker* convinces us that valid government action confers antitrust immunity only when government determines that competition is not the *summum bonum* in a particular field and deliberately attempts to provide an alternate form of public regulation." *Id.* at 30.

The instant Complaint charges defendant with illegal restraint of trade on a nationwide basis. It does not attack the action of any state official or agency. Unlike the situation in *Parker,* the challenged activity of NSPE and its members was a private conspiracy in restraint of trade and not conducted pursuant to the command of any state legislature. There is no evidence of any state enforcement machinery, present in *Parker,* which suggests that when the 16 states decided to prohibit competitive bidding they also intended to establish an alternate form of public regulatory control. Defendant's activities are plainly interstate in nature, unencumbered by the regulations of individual states. The extrapolation of *Parker* urged by defendant is both unfounded in logic as well as in law. The doctrine of state immunity enunciated by the Court in *Parker* simply has no applicability to a code of ethics which has been formulated outside the command and supervision of a state agency.

For the reasons stated *supra,* the Court finds that promulgation and enforcement of Sec. 11(c) by NSPE, its members and state societies, constitutes a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of § 1 of the Sherman Act.

Findings of Fact and Conclusions of Law are annexed hereto.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Findings of Fact Proposed by Plaintiff and Adopted by the Court:

1. The Defendant, National Society of Professional Engineers ("NSPE"), is

a non-profit membership corporation organized and existing since 1935 under the laws of the State of South Carolina with its principal place of business located in Washington, D. C. NSPE maintains offices, transacts business, and is found within the District of Columbia.

2. NSPE is composed of approximately 69,000 members who reside and are located throughout the United States and in some foreign countries. About 55,000 of these individuals are full members who are engineers holding a certificate of registration or license as a professional engineer under the registration and licensing laws of the several states of the United States. NSPE also has other grades of membership, including senior associate members, associate members, land surveyor members and student members. These latter grades of membership carry with them various limitations upon the right to vote or otherwise participate in NSPE activity.

3. The purposes and objectives of NSPE deal with the non-technical aspects of the practice of engineering. These objectives include the promotion of the professional, social and economic interests of engineers.

4. Approximately 12,000 of Defendant's members are engaged in consulting engineering, rendering various types of engineering services to governmental, industrial and private clients for a fee. These members are employed by or operate engineering firms of various sizes and in some instances are engaged as sole practitioners of their occupation. Defendant's remaining members are engaged in educational fields or are employed by governmental entities, construction firms, or other industrial organizations.

5. As part of its organization, NSPE has. five practice divisions which are designed to provide effective forums for discussion and united action on the part of its members with common interests. One of these is known as Professional Engineers in Private Practice ("PEPP"), which is devoted to serving the interests of the consulting engineer member of NSPE. PEPP has a Board of Governors composed of one representative from each of the 49 NSPE state societies which have PEPP practice divisions. PEPP also has its own officers elected by its membership and an Executive Committee.

6. All of the states have laws which provide for the licensing or registration of engineers as qualified to offer engineering services to the public within their state. While the provisions of these licensing laws vary from state to state, they usually require an individual applying for certification to be a graduate engineer, to have at least four years of experience and to pass a written examination. Upon successful completion of these requirements, an engineer receives a certificate of registration, is permitted to use a seal designating him as a licensed professional engineer and may offer his services to the public. These laws are administered by state boards comprised of engineers. Approximately 75% to 80% of the members of these state boards are also members of NSPE.

7. There are approximately 750,000 to 800,000 graduate engineers in the United States. Of this number about 325,000 are registered as professional engineers under the laws of at least one state. About half of the registered professional engineers in this country are engaged in offering services to the public as consulting engineers. The majority of these engineers practice in five broad areas of engineering; i. e., civil engineering, mechanical engineering, electrical engineering, chemical engineering and mining engineering. Within these broad categories there may also be various more specialized areas of engineering. State registration laws often impose a requirement that licensed engineers only practice in areas where they are qualified and competent. Failure to do so may subject an engineer to sanctions imposed by the state engineering board which could include a loss of his license to practice.

8. NSPE members often are licensed to perform engineering services in several states. These members and the engineering firms with which they are affiliated regularly perform services in states other than the state in which they maintain their principal place of business. At a given time, a large engineering firm may be engaged in projects located in as many as 32 different states.

9. Engineering firms with which NSPE members are affiliated often maintain offices in states other than those in which their principal place of business is located and also maintain offices in foreign countries. These firms perform and offer to perform services for clients on a multi-state, regional or national basis.

10. NSPE members are principals in or chief executive officers of some of the largest engineering firms in the United States.

11. NSPE members and their engineering firms provide a wide variety of services in connection with the study, design and construction of structures located throughout the United States and in foreign countries. These services include pre-feasibility studies, feasibility studies, planning, preliminary studies, the preparation of drawings, plans, designs, specifications, cost estimates, manuals and reports, consultations, surveys, and inspection. Engineering firms also provide various related services such as soil boring and surveying, reproduction of drawings and specifications, economic and financial surveys and data processing, both for other engineers and governmental or commercial clients.

12. NSPE members and their engineering firms perform this work in connection with such projects as interstate highways, airports, harbors, utilities, communication facilities, commercial buildings, housing and community facilities, waterways, freight terminals, electrical generation and transmission facilities, fuel distribution and storage facilities, educational facilities, medical facilities, industrial, manufacturing and mining facilities, pipelines, water collec-tion, distribution and treatment facilities and bridges.

13. As part of their function, NSPE members and their engineering firms regularly designate and specify the types, grades and quantities of materials and products to be used in the construction of particular projects upon which they work. These materials and products must regularly be obtained from states other than the state in which a project is located and transported to the project site.

14. Approximately 50% to 80% of the cost of construction in any given facility is a direct result of engineering work performed for that facility and designations made by the engineer concerning the equipment and systems to be incorporated into that facility. On the average, engineering work on a project directly influences or controls about 65% of the cost of constructing and equipping that project.

15. Reports, studies, plans and specifications for all types of projects upon which NSPE members and their engineering firms work are regularly transmitted across state lines from the state in which the engineer or engineering firm has an office to another state where the project or a prospective client may be located. Personnel employed by engineering firms, including engineers, field testing employees and others, travel across state lines to conduct on-site inspections and consultations concerning projects undertaken in states other than the state in which the engineering firm has its office.

16. Most design and construction projects require the services of both architects and engineers and the two are related disciplines. Frequently, an engineer performs his services for an architect who has been retained by the client to provide for the design of a facility. The architect and engineer will work together on such a project and in some cases the architect will be designated as the prime contractor with the engineer performing in a subcontracting capacity. Architect-engineer ("A–E") fees togeth-

er usually average about 10% of the construction cost of any given project. Normally, engineering fees alone average approximately 5% to 6% of construction cost.

17. For the year 1972, the 438 largest A–E design firms accounted for about $2.2 billion in fees. The federal government annually spends approximately $140,000,000 on architect-engineer fees, a figure which is less than 1% of the total government procurement budget and only about 3% of total annual purchases of A–E services in the United States of about $4.7 billion. The total amount of construction costs affected by engineering services provided by Defendant's members and their firms is substantial. For example, Camp Dresser & McKee, Inc., a large environmental engineering firm headquartered in Boston, Massachusetts, currently has under progress design work for about $800,000,000 worth of construction. If reports and preliminary studies are included, the amount of potential construction costs currently involved in that firm's work rises to about $2 billion.

18. Engineering firms with which NSPE members are affiliated vary in size from one-man engineering firms to extremely large organizations employing in excess of 1,500 individuals. These organizations may take the form of sole proprietorships, partnerships, privately held corporations or publicly held corporations.

19. All of these firms are engaged in offering their services to the public for a fee. These firms expect to receive a profit for the sale of their services and calculate their fees to provide for that profit, taking into account the interests of their stockholders, boards of directors or other principals. Profit margins for these firms range at least as high as 10% to 12%.

20. Many engineering firms actively market and promote the sale of their services to prospective clients. These marketing activities include the employment of marketing specialists and business development personnel who seek contacts with individuals, firms or governmental agencies which might be potential sources of business. In addition, these firms employ materials in the form of promotional brochures describing their operations, past work, capabilities and personnel which they distribute to prospective clients.

21. Forty, or approximately 9% of the top 438 A–E design firms in the United States in 1972 were publicly held corporations or affiliated with corporations whose stock is publicly traded. These publicly held firms accounted for about 14% of the receipts generated by the leading 438 A–E design firms in 1972. Thirty-one, or approximately 15%, of the top 200 A–E design firms in the United States in 1972 were publicly held corporations or affiliated with publicly held corporations. These publicly held firms accounted for about 18% of the receipts generated by the leading 200 A–E design firms in 1972.

22. Some of the publicly held corporations which own A–E design firms are engaged in manufacturing segments of the economy or in other activities unrelated to the rendering of engineering services. There have been periods where engineering firms have been acquired by conglomerate corporations and, in some instances, these firms have changed corporate hands on several occasions. The prevalence of this acquisition activity has varied with stock market conditions at any given time and the financial advantages of such affiliations.

23. In some instances, engineering firms are affiliated with or owned by architectural firms or by other corporations engaged in allied or related fields, such as construction management and real estate development, and these relationships may result in a very large group of firms controlled by a holding company. On occasion, engineering firms sell non-engineering related services such as computer services. Also, these firms have sometimes acquired other partnerships or corporations en-

gaged in architectural or engineering work in order to increase their size and geographic coverage.

24. There are other large companies which are engaged in both engineering and construction work known as design/construct firms. These companies differ from typical consulting engineering firms because they have the capability of performing the construction work as well as the A–E design work associated with particular building projects. These firms also perform A–E design functions exclusive of any construction work. Thirty, or approximately 48% of the top 62 design/construct firms in the United States in 1972 were publicly held corporations or were affiliated with publicly held corporations whose stock is publicly traded. These publicly held firms accounted for about 65% of the $26 billion worth of new project contracts awarded to the 62 leading design/construct firms in 1972.

25. Engineering firms employ a large number of non-engineering personnel in connection with their operations. These employees may include clerks, draftsmen, secretaries, administrative personnel, accountants, specifications writers, estimators, and other similar types of personnel. In most cases, the number of non-engineering personnel in a firm exceeds the number of engineers. These employees account for a substantial part of the overhead, administrative, general and project costs charged to the client who engages a firm to do engineering work. For example, a major part of the cost of a given engineering project consists in translating design concepts to blue-prints and written specifications. The work of translating these concepts to complete plans and written specifications is ordinarily performed by an engineering firm's non-professional employees.

26. Defendant's Board of Directors adopted the present format of the NSPE Code of Ethics in July 1964. This Code includes Section 11(c), which has been in continuous effect to the present time. Section 11(c) provides:

Section 11—The Engineer will not compete unfairly with another engineer by attempting to obtain employment or advancement or professional engagements by competitive bidding

. . .

c. He shall not solicit or submit engineering proposals on the basis of competitive bidding. Competitive bidding for professional engineering services is defined as the formal or informal submission, or receipt, of verbal or written estimates of cost or proposals in terms of dollars, man days of work required, percentage of construction cost, or any other measure of compensation whereby the prospective client may compare engineering services on a price basis prior to the time that one engineer, or one engineering organization, has been selected for negotiations. The disclosure of recommended fee schedules prepared by various engineering societies is not considered to constitute competitive bidding. An Engineer requested to submit a fee proposal or bid prior to the selection of an engineer or firm subject to the negotiation of a satisfactory contract, shall attempt to have the procedure changed to conform to ethical practices, but if not successful he shall withdraw from consideration for the proposed work. These principles shall be applied by the Engineer in obtaining the services of other professionals.

27. In addition to its former Rules of Professional Conduct and Section 11(c) of the current NSPE Code of Ethics, the Defendant has adopted and had in effect, since at least 1960, a professional policy expressing the official position of the Defendant with respect to price competition for engineering services. Professional Policy 10 has stated NSPE's opposition to competitive bidding for engineering services, declared competitive bidding to be an unethical practice requiring an engineer to remove himself from consideration for a job, defined competitive bidding in terms identical to that contained in Section 11(c) and

contained a definition of engineering services. NSPE professional policies are adopted by its Board of Directors and constitute guidelines to supplement and define the Defendant's Code of Ethics for the conduct of its members and their firms.

28. In July 1966, the NSPE Board of Directors adopted Professional Policy 10–F which was continuously in effect until July 1972. Policy 10–F stated the Defendant's policy that price competition by engineers is an unethical practice requiring the professional engineer to remove himself from consideration for a job and applied that policy "to all services provided by a professional engineering firm." Policy 10–F was adopted upon the recommendation of NSPE's PEPP section and its Competitive Bidding Committee in order to "make it clear beyond all doubt that NSPE opposes competitive bidding by engineers in private practice for any service performed by an engineer or firm in private practice" and to avoid suggesting "loopholes" to the membership.

29. In July 1972, the NSPE Board of Directors adopted Policy 10–G to replace Policy 10–F. Policy 10–G permits NSPE members to quote prices for certain types of engineering study and research and development contracts where price proposals are required and competition is provided by other than consulting engineering firms. Thus, Policy 10–G states that "engineering services" are defined as those "associated with the study, design and construction of real property improvements . . . ." Policy 10–G remains in effect at the present time.

30. The NSPE Board of Ethical Review ("BER") has uniformly interpreted the Defendant's ethical rules against competitive bidding for engineering services as prohibiting the submission of any form of price information to a prospective customer which would enable that customer to make a price comparison on engineering services. A requirement that such information be provided imposes an obligation upon the engineering firm to withdraw from consideration for that job. Section 11(c) prohibits engineers from both soliciting and submitting such price information.

31. The BER, however, has also ruled that price proposals by engineering firms which are based upon a recommended state society fee schedule are ethically permissible and specifically contemplated by the Defendant's ethical rules against competitive bidding. Granting a competitive discount off the recommended fee schedule, on the other hand, is not considered ethical.

32. Also, the BER has held that, while an engineer may submit a recommended fee schedule to a client prior to his selection for a job, he is prohibited by Section 11(c) from submitting a fixed fee in competition with another engineer.

33. In a March 1966 report to the PEPP Executive Board, the Competitive Bidding Committee recommended that NSPE institute a program to educate all professional engineers, including NSPE members and prospective clients, concerning Defendant's policy against competitive bidding for engineering services. This effort was to include the preparation of pamphlets and the giving of lectures or speeches at PEPP meetings at the national and local levels.

34. This recommendation was adopted by PEPP and the Competitive Bidding Committee was directed to prepare pamphlets on the evils of competitive bidding for engineering services and to arrange for speakers on the subject matter of competitive bidding.

35. The Competitive Bidding Committee drafted pamphlets directed towards engineers and prospective clients on the subject of competitive bidding for engineering services. Members of the Committee also gave speeches on the subject matter at regional PEPP meetings. In one such speech a member of the Committee advised members of NSPE not to engage in competitive bidding and cited the fact that price competition could only result in the lowering of engineering fees. This speech also

described an educational program endorsed by the NSPE Board of Directors which included the preparation of pamphlets on competitive bidding to be sent to all licensed engineers, not only NSPE members, and a program of discussions to be included at all PEPP meetings at the national and local levels during the latter part of 1966 and 1967.

36. In June 1967, the Competitive Bidding Committee sent three pamphlets on the subject of price competition for engineering services to each member of the PEPP section of NSPE. Each pamphlet was intended for a separate audience and designed to help discourage price competition. They were: (1) *The Dangers of Competitive Bidding for Professional Engineering Services in Industry*, designed for distribution to industry executives responsible for selecting engineering consultants on behalf of their firm; (2) *The Dangers of Competitive Bidding for Professional Engineering Services in Public Works*, directed to governmental officials responsible for selecting engineering consultants on behalf of their agencies; and (3) *The Dangers of Competitive Bidding for Professional Engineering Services*, directed to the PEPP member "in whose hands lies the power to stem the practice by refusing to submit price bids for your work." In the letter transmitting these pamphlets to PEPP members, the chairman of the Competitive Bidding Committee also stated:

All responsible members of the engineering profession are urged to give the enclosed pamphlets wide distribution to those industry executives and public officials with whom you deal. And lastly, we urge you to route the pamphlet directed to the engineer to members of your own staff so that they can fully comprehend the potential threat to their profession engendered by competitive bidding.

37. The pamphlets directed at prospective clients, either in public works or industry, were regularly distributed to clients by NSPE when it had come to the Defendant's attention that those customers had requested a price proposal from a member of NSPE. In this manner, they were used to discourage a customer from utilizing price competition in his selection procedure for engineering services and often this attempt to frustrate price competition was successful.

38. When notified by its members that prospective clients, both public and private, were soliciting price proposals for engineering services, Defendant regularly sent letters to those prospective purchasers in an effort to obtain withdrawal of the request.

39. In July 1964, Defendant's Board of Directors adopted, as part of the NSPE Code of Ethics, Section 9(b). This section has been in continuous effect to the present time and has remained unchanged since its adoption in 1964. Section 9(b) provides:

Section 9—The Engineer will uphold the principle of appropriate and adequate compensation for those engaged in engineering work . . .

b. He will not undertake work at a fee or salary below the accepted standards of the profession in the area.

40. The BER has held that the Defendant's ethical rules concerning the undertaking of work at accepted levels of fees or salaries in particular geographic areas prohibit an engineer from regularly charging fees below those contained in the recommended fee schedule of the state professional engineering society of the state in which the work is being undertaken.

41. While it is unethical for an NSPE member to regularly charge fees below those designated in a state society fee schedule, BER has ruled that it is not a violation of Section 9(b) of the NSPE Code of Ethics for an engineer to charge a fee below that indicated in a state society fee schedule when the work undertaken by the engineer is repetitive and permits him to use the same design as had been used in a previous project. This applies only if the state society fee schedule is silent on the subject of sug-

gested fees for repetitive work and if the engineer "does not regularly attempt to undercut normal fees for the area, and provided that his motive . . . is not to reduce the normal fee for the work involved for the purpose of a competitive advantage over fellow engineers."

42. NSPE also publishes a pamphlet entitled *So You Want to Open A Consulting Office* which it distributes to members embarking upon careers in private practice. This pamphlet admonishes engineers not to engage in fee cutting to get an engineering job. They are advised that fee schedules are published by most engineering societies serving consulting engineers such as the PEPP section of NSPE, referring specifically to NSPE's *Guide for Professional Engineers' Services.* The pamphlet informs members that many state societies also publish fee guides and instructs that "they should be relied upon as guidelines in the establishment of a fee for a given job." While instructing the engineer to support the concept of ethical practice in general terms, the pamphlet directs the engineer's specific attention to the proposition that competitive bidding for a proposed project is unethical and that fee cutting is also unethical and "falls into the same category as competitive bidding."

43. The Committee on Federal Procurement of A–E Services ("COFPAES") is a membership committee of national A–E societies, including the Defendant. COFPAES was formed in or about 1967 and was originally organized to promote the position shared by its member societies that the selection of architects and engineers by agencies of the federal government should be accomplished without resort to competitive bidding or other forms of price competition. One of the methods for achieving this objective was to engage in lobbying activity directed at securing the passage of legislation on this subject. The result of this lobbying activity was the enactment in October 1972 of the Brooks Bill, 40 U.S.C. §§ 541–544 (Supp. III, 1973). In addition, the regular meetings of COFPAES served as a forum for its members to discuss requests for A–E price proposals and other matters of common interest concerning the governmental procurement of A–E services. COFPAES has continued in existence up to the present time.

44. In addition to the Defendant, the membership of COFPAES has included throughout its period of existence the American Institute of Architects ("AIA"), Consulting Engineers Council ("CEC"), American Institute of Consulting Engineers ("AICE"), American Society of Civil Engineers ("ASCE"), and the American Road Builders Association—Engineering Division ("ARBA"). In 1972, AICE and CEC, organizations composed of consulting engineering firms, merged into the American Consulting Engineers Council and that society retained its membership in COFPAES.

45. During the period from the formation of COFPAES to at least October 1971, all COFPAES member societies had ethical prohibitions or limitations upon price competition by their individual members in the sale of A–E services.

46. The activities of COFPAES and its member societies were not confined to lobbying for legislation. COFPAES societies also acted jointly to prevent governmental agencies from obtaining price proposals for A–E projects from their individual members. An example of such joint action, in which NSPE actively participated, involved COFPAES efforts to prevent the implementation of the Department of Defense's test procedure for A–E procurement in 1970 ("DOD test"). In the summer of that year, the Department of Defense announced its intention to test a new procedure for the selection of A–E firms which would include an element of price competition. This procedure, known as the "two envelope" procedure, provided that pre-qualified A–E firms interested in a particular project under consideration be invited to submit two sealed envelopes separately containing a techni-

cal proposal and a non-binding price estimate. The technical proposals were to be opened first by a selection board and a ranking of the proposals on their technical competence was to be accomplished. After the technical rankings had been completed, the envelopes containing the price estimates would be opened by the selection board and a determination made as to whether the price considerations warranted a change in the technical rankings of the A–E firms. After evaluation of both technical proposals and prices and any resulting change in ranking, negotiations would be initiated with the selected firm and a contract awarded if agreement could be reached. The test procedure was to be conducted for only a period of one year and in only two military construction districts. By the time of this announcement, COFPAES member societies had already agreed that the "two envelope" procedure was unethical and unsatisfactory since it was "too dependent upon the integrity of the client."

47. On or about August 19, 1970, COFPAES advised Barry J. Shillito, the Assistant Secretary of Defense, of its "unequivocal opposition" to the DOD test procedure and warned that the Department could not expect even "minimal endorsement or approval of any of the six architectural-engineering societies which comprised the committee." Nevertheless, on or about August 24, 1970, the Department publicly announced the commencement of the test.

48. Within days of the announcement, CEC, AIA and NSPE all advised officials of their organizations of the existence and implications of the DOD test. At the same time, AIA and NSPE cooperated closely on the drafting of statements to be sent to their members regarding the test. Despite CEC's antitrust concern, AIA and NSPE agreed that "we should take a stand if the prohibition in the Code of Ethics is to mean anything." In urging the sending of a memorandum to all PEPP members declaring the DOD test procedure to be unethical, Milton F. Lunch, NSPE General Counsel, warned the PEPP Executive Board that

If a large number of firms do participate under the DOD procedure, which is in clear conflict with the NSPE Code provision, the likelihood is that this will support Mr. Shillito's apparent intention to impose the price competition system throughout all military offices.

49. In or about August or early September 1970, the Department of Defense issued its first invitations under the test procedure from the Naval Facilities Engineering Command headquartered in Charleston, South Carolina. These invitations were sent to architectural firms and concerned a project in the New Orleans, Louisiana, area. By September 11, 1970, CEC, AIA and NSPE had all advised their members of the existence of the DOD test and had counseled them in various ways not to participate.

50. On or about September 9, 1970, the PEPP section of NSPE advised its members that the DOD test procedure was considered unethical. The Defendant suggested that if members were invited to participate they should include a statement in the price envelope to the effect that they could not submit a definite fee prior to selection. Instead, they should enclose "an appropriate national or state society fee guide to indicate the general range of applicable fees which would form the basis of negotiations on the fee, if selected." This procedure was "based on the fact that the NSPE Code of Ethics provisions prohibiting competitive bidding specifically provides 'the disclosure of recommended fee schedules prepared by various engineering societies is not considered to constitute competitive bidding.'" Subsequently, PEPP reported the refusal of the architectural firms to submit prices in the first attempt under the DOD test procedure and asked all members to report promptly to PEPP requests for participation in the test procedure.

51. As a result of these activities, the Department of Defense was unable to obtain price proposals under its test procedure.

52. The NSPE Code of Ethics is a standard of conduct for its members consisting of a set of binding rules enforced by NSPE and its state societies. Members of NSPE are expected to follow these rules and violations of them are usually submitted for adjudication to the Defendant's state societies through which an engineer holds his membership in all three levels of the NSPE organization. The Defendant's state societies have the primary responsibility for disciplining members for ethical violations. There are provisions in the constitutions of both NSPE and its state societies which provide for expulsion or other disciplinary action, including suspension and censure, for a violation of the Defendant's Code of Ethics. In addition, any such action by a state society against a member of NSPE automatically applies at all three levels of the NSPE organization.

53. NSPE has also recommended procedures to be followed by state societies upon the filing of charges of unethical conduct against any members of NSPE at the state society level. These recommendations include procedures for interstate cooperation by state societies in instances where alleged ethical misconduct occurs in one state by engineers who are members of another state society. These procedures represent the typical practice by state societies in such matters.

54. Members of the Defendant place great importance upon being considered ethical by their colleagues. They therefore endeavor to conform their practice to the Defendant's Code of Ethics with which they and their colleagues agree and to which they and their firms abide. NSPE members expect their fellow members and their firms to similarly abide by the Defendant's Code of Ethics.

55. If a member was held to be unethical and disciplined by the Defendant or its state societies, this would have a damaging effect upon his professional standing as an engineer.

56. NSPE has promoted and coordinated the enforcement of Section 11(c) of its Code of Ethics by its state societies. The best example of this is its activity in connection with the Tri-State Airport incident in West Virginia. In late 1971, the Tri-State Airport Authority in Huntington, West Virginia, solicited proposals from engineering firms for an airport runway extension project. After initially considering qualifications of approximately 20 firms and after determining that the $500,000 fee of the first firm selected and negotiated with under the "traditional" method to be excessive, the Authority requested price proposals from five firms which had been selected as best qualified. Three of the five firms submitted price proposals.

57. In December 1971, several of the engineering firms who had been initially involved in the qualifications submittal and who were concerned with the publicity generated by the procedure called the request for price proposals to the attention of the West Virginia Society of Professional Engineers. These complainants included Leslie C. Gates, the current president of NSPE. The complaints were relayed in late December 1971 to Louis A. Bacon, chairman of the PEPP section of NSPE.

58. Mr. Bacon sent identical telegrams on or about December 31, 1971, to each of the five engineering firms suspected of having submitted price proposals to the Authority. Each telegram stated:

Attention called to unusual consulting engineering selection procedure employed by the Tri-State Airport Authority, Huntington, West Virginia. Participation weakens position of NSPE/PEPP in effort to halt use of competitive bidding procedures by

federal agencies. Strongly urge you withdraw price proposal in favor of traditional negotiation process. Entire process employed by TCAA questionable. Valid reasons, in addition to Code of Ethics, for refusing to enter into competitive bidding. Trust you will demonstrate your support of professionalism and NSPE/PEPP by withdrawing price proposal on Huntington Airport project.

Mr. Bacon also wired the president of the Tri-State Airport Authority asking that he withdraw the Authority's request for price proposals.

59. As a result of the telegram from Mr. Bacon, one of the engineering firms, Airways Engineering Corporation, advised the Authority on or about January 3, 1972, as follows:

Advice received from National Society of Professional Engineers that proposals with competitive prices as requested by Tri-State Authority are unethical[.] We concur[.] [T]herefore we withdraw our fee estimate for any basis for your making selection.

A copy of this telegram was sent to and received by NSPE.

60. The other four firms which had been contacted responded to NSPE with either denials that they had submitted competitive price proposals or explanations of their actions with respect to the submission of a price proposal to the Airport Authority.

61. In mid-January 1972, the project was awarded to the firm of L. Robert Kimball, Ebensburg, Pennsylvania, which had submitted a $300,000 maximum fee.

62. On January 12, 1972, the PEPP Board of Governors directed the PEPP Executive Board to investigate the Tri-State Airport incident "and take appropriate action thereon on behalf of NSPE/PEPP." As a result, Mr. Bacon called a special meeting on January 13, 1972, of National Directors and presidents from member societies in the four states in which the firms suspected of having submitted price proposals were located. Those in attendance included officials from NSPE state societies in the District of Columbia, Pennsylvania, North Carolina and Kentucky as well as the president of the West Virginia State Society, the state in which the project in question was located.

63. At this meeting, Mr. Bacon indicated that NSPE expected the state societies to enforce the Defendant's Code and it was decided that PEPP would coordinate an investigation of the incident by holding an investigatory hearing with the five firms in question and their state societies. This fact finding hearing was to discover whether or not a basis existed upon which the state societies could prosecute the firms involved for violations of Section 11(c). NSPE officials felt the investigation would "demonstrate to all observers that we can and will keep our own house in order" and that if no action were taken at this time "the situation will crop up again and again."

64. On or about January 26, 1972, Mr. Bacon reported to the PEPP Executive Board that he would conduct a fact finding hearing with the firms involved and officials of their state societies to facilitate the gathering of facts. In his report, Mr. Bacon advised that the state society officials would be asked after the hearing to

. . . determine if there seems to be sufficient evidence of violation of the Code of Ethics and if there should be a hearing by their own state society concerning the activities of the firm from their state.

I believe the above program carries out the dictates of our Board of Governors and the motion they passed in Dallas. Incidentally, we have had very favorable comments from several of the firms stating that they are pleased that "NSPE–PEPP is doing something."

The NSPE membership would be advised of this investigation "so that all of the members of the Society are not

only aware of our activity, but recognize that we intend to enforce our code of ethics when cases are brought to our attention."

65. The fact finding hearing was held on or about February 2, 1972, in Huntington, West Virginia, and was chaired by Mr. Bacon on behalf of the PEPP section of NSPE. Representatives of five state engineering societies and four of the five firms involved attended. One of the firms refused to attend.

66. At the hearing, the firms were questioned about their participation in the Authority's selection procedure. At the conclusion of the hearing, the state societies were advised that any action against the individual firms for a violation of Section 11(c) of the Code of Ethics was their responsibility. As a result of this hearing, at least three NSPE state societies initiated further investigations.

67. On or about March 7, 1972, NSPE's Pennsylvania State Society contacted the two firms located in their state requesting additional information as to whether they had violated Section 11(c) of the Code of Ethics. The firm which had received the airport job responded with a defense of its actions and claimed that it had not been engaged in competitive bidding. The other firm, which had refused to attend the investigatory hearing in Huntington, stated "that the subject inquiry can serve no useful purpose, and could possibly subject participants in such a fact-finding exercise to investigation by the Justice Department on the basis of collusion to restrict competition."

68. The Ethics Committee of the West Virginia State Society recommended that three of the firms be advised that they had violated Section 11(c) of the Code of Ethics.

69. The Kentucky State Society reported to NSPE that it had cleared the firm in its state of any violation of the Code of Ethics.

Findings of Fact Proposed by Defendant and Adopted by the Court:

1. The selection of a professional engineer is a matter of judgment, based in large part on the professional's reputation and demonstrated competence.

2. Engineering licensing and registration boards throughout the United States have the authority to discipline registered professional engineers and to suspend and revoke their licenses.

3. All engineers who offer their services to the public must be registered as professional engineers.

4. Although there is a very large and growing number of fields of specialization in professional engineering, the main branches of professional engineering are civil, mechanical, mining, chemical, nuclear, aerospace and electrical engineering. Each of these branches of professional engineering contains specialties within it. There are more than 25 fields of specialty within civil engineering alone. Approximately 85 percent of practicing professional engineers are engaged in civil, mechanical, mining and electrical engineering.

5. Some professional engineering firms are sole proprietorships; others are associations; others are partnerships; others are incorporated.

6. Although there are few sources of accurate comprehensive data on the size of professional engineering firms throughout the United States, it is known that 60 percent of the engineering firms which carry professional liability insurance have five engineers or less.

7. The emergence and growth of large engineering firms is related to the ever-increasing complexity of engineering problems.

8. A graduate engineer is an individual who has received a collegiate degree from an institution of higher learning in engineering, but who is not necessarily a registered professional engineer.

9. There are approximately 750,000 to 800,000 graduate engineers in the United States.

10. There are approximately 325,000 registered professional engineers in the United States.

11. In 1934, NSPE had four affiliated state professional engineering societies. Today, NSPE is affiliated with professional engineering societies in each of the 54 states and territories of the United States and the District of Columbia. In addition, more than 500 local chapters are affiliated with NSPE.

12. When a member joins NSPE, he joins the applicable state society and local chapter at the same time. Conversely, when he joins the state society and local chapter, he also joins NSPE.

13. NSPE does not have the power or authority under its constitution or by-laws to order or compel an affiliated state society to take any action.

14. NSPE does not have the power or the authority to prevent or forbid an affiliated state society from doing anything, or to mandate a state society to do anything.

15. The only authority of NSPE over its affiliated societies is the authority to withdraw their charters of affiliation.

16. Among its components, NSPE has an executive director; a general counsel; a staff; a board of directors; an executive committee; five practice divisions for member professional engineers employed (a) by construction firms, (b) by industry, (c) by government, (d) in education and (e) in private practice; numerous committees, including an ethical practices committee; and a board of ethical review.

17. The officers of NSPE comprise its executive committee. The members of the executive committee of NSPE are the president, the past president, the president-elect, the treasurer, six vice presidents selected from the six geographic regions of the United States but voted on by the entire membership of NSPE, and five vice presidents who are the chairmen of NSPE's five practice divisions.

18. NSPE communicates and cooperates extensively with other professional and technical societies in the engineering profession and in other professions.

19. Representatives of NSPE and representatives of other technical and professional societies in the engineering profession and other professions participate in a number of inter-society committees.

20. The ethics of NSPE are set forth in its Code of Ethics.

21. NSPE's Code of Ethics is and has been available to the public and widely and continuously disseminated by NSPE throughout the United States.

22. Prior to 1964, the ethical code adopted by NSPE was the Canons of Ethics, which had originally been developed by the Engineers Council for Professional Development, and which was supplemented by Rules of Professional Conduct developed and adopted by NSPE.

23. In 1964, NSPE's Code of Ethics was promulgated. NSPE's Code of Ethics reorganized, revised, integrated and supplanted the pre-existing Canons of Ethics and supplemental Rules of Professional Conduct.

24. The duties and functions of NSPE's ethical practices committee include development of material on ethical standards of the engineering profession for dissemination to NSPE and for the use of other engineering organizations; cooperation with other committees and units of NSPE and with other organizations with the purpose of coordinating activities relating to the ethics of the engineering profession; conducting studies of the extent to which ethical standards are being observed and areas which require further educational effort; conducting a continuing study of desirable revisions to NSPE's Code of Ethics for recommendation to the board of directors on matters of ethics.

25. The NSPE board of directors holds ultimate authority to approve,

disapprove or modify the action of the NSPE ethical practices committee.

26. Although not required by the constitution or bylaws of NSPE to be so composed, by tradition each of the five practice divisions of NSPE is represented on the NSPE board of ethical review.

27. The NSPE board of ethical review promulgates authoritative interpretations of NSPE's Code of Ethics. These interpretations are contained in the opinions of the board of ethical review.

28. As they are issued, the opinions of NSPE's board of ethical review are published in the official monthly magazine of NSPE, *Professional Engineer*. *Professional Engineer* is sent to each member of NSPE, and to others, and is available to the public. From time to time the opinions of the NSPE board of ethical review are collected and published in bound volumes.

29. The NSPE board of ethical review's consideration of an ethical problem is typically initiated by an inquiry, which is generally brought to the attention of NSPE's headquarters by a member of NSPE.

30. When inquiries regarding uncertain interpretation of the NSPE Code of Ethics are brought to his attention, NSPE's general counsel ordinarily prepares a draft opinion which sets forth the facts, the relevant provisions of NSPE's Code of Ethics, and an analytical discussion. The draft is then circulated among the members of the NSPE board of ethical review for their study and comments. Thereafter, the members of the board of ethical review communicate among themselves with regard to the matter and study it in depth.

31. After studying pending cases, the members of NSPE's board of ethical review meet to discuss the cases and to agree upon final opinions.

32. In its opinions, the NSPE board of ethical review does not disclose the identities of the parties to cases.

33. NSPE board of ethical review opinions are intended to provide a guide for conduct by professional engineers in fact situations similar to those described in the opinions.

34. When an apparent violation of NSPE's Code of Ethics is brought to NSPE's attention, it generally refers the complaint to its appropriate affiliated state society.

35. NSPE promulgates from time to time, disseminates and makes publicly available the administrative policies for its internal governance, as well as the professional policies of NSPE.

36. Although NSPE's Code of Ethics prohibits competitive bidding by professional engineers in certain circumstances, no person has ever been expelled from or in any way disciplined by NSPE for engaging in that activity.

37. Professional engineers generally seek to conduct themselves consistently with the principles set forth in NSPE's Code of Ethics, and would be disturbed if their colleagues considered them unethical in practice.

38. The codes of ethics of state and national professional engineering societies, including NSPE, figure significantly in the activities of state engineering registration and licensing boards, and in the activities of state legislatures regarding professional engineering.

39. The laws of most of the states provide that professional misconduct is a basis for suspending or revoking the license of a registered professional engineer.

40. In determining what is appropriate conduct of registered professional engineers, in specific cases and generally, the state boards of engineering registration and licensing are guided by the ethics of the engineering profession, as set forth in NSPE's Code of Ethics.

41. NSPE's ethical practices committee, in cooperation with other professional engineering organizations, has prepared the NSPE model rules of conduct and model registration requirements. NSPE has encouraged and encourages the adoption of said model rules and requirements by the state boards of engi-

neering registration and licensing. The model rules of conduct prepared and disseminated by NSPE are based in large part upon NSPE's Code of Ethics.

42. The ethics and ethical policies of the architecture and engineering professions underlie COFPAES' activities.

43. COFPAES does not have and has not had power to require its member societies to do anything.

44. The clients of professional engineers include individuals, businesses, medical, academic, and other institutions, and governments and governmental bodies at the local, regional, state and national levels.

45. Under the traditional method of retaining professional engineers, the prospective client determines his engineering needs to the extent he can. He then seeks out, and may interview, qualified and informed professionals, to discuss his problem. The prospective client may identify 1, 2, 3, 4 or more professional engineers or engineering firms, interview them, obtain their qualifications, determine their backgrounds, and initially select the one who, in the judgment of the client, is the best qualified and most appropriate for his needs. Thereafter, the client and the initially selected professional discuss the problem and then they discuss the proposed fee arrangement. Should they, for any reason, be unable to agree upon a mutually satisfactory fee arrangement, the client approaches another professional.

46. The traditional method by which professional engineers are retained by clients is and has been for many years known to professional engineers and to existing and prospective clients of professional engineers throughout the United States.

47. The traditional method by which professional engineers are retained by clients is and has been for many years the subject of promulgated ethics and other informational and educational statements and publications of NSPE.

48. Professional engineers frequently transmit informational material setting forth their professional qualifications and experience and the qualifications and experience of their firms, in response to requests by prospective clients.

49. Typically, under the traditional method, several professional engineers or engineering firms are considered by a prospective client for a particular assignment on the basis of their prior relevant experience and performance; professional training and reputation; proximity to the site of construction or production; and most basically, the prospective client's relative confidence in their competence and trust of them.

50. Under the traditional method of obtaining the services of a professional engineer, professional competence is at the center of the procurement process and is the principal basis of choice.

51. Under the traditional method of obtaining professional engineering services, the professional engineer or engineering firm is initially selected on the basis of qualifications and specific competence to perform the assignment.

52. Under the traditional method of obtaining professional engineering services, fee proposals are not sought and fee negotiations are not undertaken until a professional engineer or engineering firm has been initially selected by the prospective client.

53. Under the traditional method of obtaining professional engineering services, the submission of a proposed fee or other forms of price bidding prior to initial selection of the professional engineer or engineering firm is considered improper and inappropriate.

54. The variety of professional engineering problems and assignments is such that particular engineers and engineering firms have specialized qualifications and competence which makes them best suited to handle specific problems of particular clients in specific locations under specific conditions.

55. The final engineering drawings and specifications form the basis for effective competitive bidding by construction contractors in that they permit

each contractor to know precisely what materials and services his bid will cover.

56. NSPE Professional Policy 10-G reflects the traditional method of obtaining professional engineering services and states that:

The practice of engineering is a learned profession requiring of its members sound technical training, broad experience, personal ability, honesty and integrity.

Evaluation of capability, capacity, stability, experience and interest is essential in any selection proceeding in order that the best qualified engineer may be selected. Only after the engineer has been designated should negotiations on contract terms and conditions be entered into.

Competitive bidding for professional engineering services is not in the best public interest because such a procedure creates the danger of awarding the contract for services to other than the best qualified engineer or engineering firm.

For the purpose of this policy, "Engineering Services" includes professional services associated with the study, design and construction of real property improvements (public and private) including pre-feasibility and feasibility studies, comprehensive and general planning, preliminary studies, preparation of drawings, plans, designs, specifications, cost estimates, other studies and preparation of manuals and reports, consultations, performance of surveys, inspection and development related to the preceding categories.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter of this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, as well as venue under Section 12 of the Clayton Act, 15 U.S.C. § 22, as Defendant maintains its principal place of business and is found within the District of Columbia.

2. Defendant's members are engaged in and have a substantial effect upon interstate trade and commerce through the sale of their engineering services.

3. Through the promulgation and enforcement of Section 11(c) of Defendant's Code of Ethics, Defendant, its members and state societies have and are continuing to act in a combination and conspiracy having as its purpose and effect the suppression and elimination of price competition for the sale of engineering services in *per se* violation of § 1 of the Sherman Act (15 U.S.C. § 1).

4. Plaintiff is entitled to injunctive relief for the purpose of permanently restraining the aforementioned combination and conspiracy and removing any reference to the competitive bidding ban on engineering fees from defendant's Code of Ethics, policy statements, opinions of its Board of Ethical Review, or any other official statement, guideline or publication issued by Defendant.

Counsel for plaintiff shall furnish an appropriate order not inconsistent with the Court's Findings of Fact and Conclusions of Law stated herein.