**UNITED STATES of America**

v.

**NATIONAL SOCIETY OF PROFES-
SIONAL ENGINEERS, Appellant.**

**No. 76–1023.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 18, 1977.

Decided March 14, 1977.

Lee Loevinger, Washington, D.C., with whom Martin Michaelson, James H. Sneed and Janet L. McDavid, Washington, D.C., were on the brief, for appellant.

Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., with whom Susan J. Atkinson, Atty., Dept. of Justice, Washington, D.C., was on the brief, for appellee. Laurence K. Gustafson, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellee.

Before WRIGHT, TAMM and LEVENTHAL, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

The U.S. Department of Justice presses this antitrust suit against the 65,000 member National Society of Professional Engineers. It claims that the Society's efforts to enforce Section 11(c) of its Code of Ethics, which prohibits any form of competitive bidding on engineering projects,[1] violate Section 1 of the Sherman Act.

---

1. Section 11(c) of the Code provides:

    Section 11—The Engineer will not compete unfairly with another engineer by attempting to obtain employment or advancement or professional engagements by competitive bidding, . . .

    \* \* \* \* \* \*

After extensive discovery and a trial, the district court found that the Society's actions had the requisite impact on interstate commerce, that the engineering profession was not entitled to an exemption from the antitrust laws, and that the Society's prohibition of competitive bidding, as a form of price-fixing, was a *per se* violation of the Sherman Act. The District Court's extensive findings of fact and conclusions of law are set out at 389 F.Supp. 1193.

That ruling was appealed directly to the Supreme Court under the then applicable statute.[2] No action was taken, however, until one week after the Supreme Court's decision in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), when the Court vacated and remanded the district court's ruling for reconsideration in light of *Goldfarb.* 422 U.S. 1031, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975). After reargument, the district court issued a second opinion, reported at 404 F.Supp. 457. The district court viewed the *Goldfarb* decision, which held unlawful minimum fee schedules for legal services, as supportive of its original determination of illegality, and therefore reaffirmed its earlier findings and conclusions. The district court then entered judgment enjoining the defendant from adopting any rule or policy statement which in any way prohibits or discourages the submission of price quotations or states or implies that price competition is unethical and further ordered the defendant "to state in any publication of its Code of Ethics that the submission of price quotations for engineering services at any time and in any amount is not considered an unethical practice."

On appeal, defendant contends, *inter alia,* that the Supreme Court's opinion in *Goldfarb* leaves room for restraints on competition among professionals where those restraints serve a reasonable objective, and that the prohibition on price competition among consulting engineers is justified by the peculiar nature of the services they provide. In particular, defendant argues that the impossibility of formulating precise specifications for many engineering tasks requires that engineers engage in extensive consultation and planning with the purchaser before making a price estimate. Evils are inherent, it is said, in estimates that can only be guesses. An engineer who is forced to bid competitively on the basis of a buyer's general requirements will be under pressure that will tend to encourage optimism and mistake, and possibly cunning, all thrusting him toward an unreasonably low bid. Later, in order to avoid disastrous losses, the engineer may try to pressure the purchaser into renegotiating the contract or, failing that, may cut corners, to the disadvantage of the client and in all likelihood the public. In sum, defendant argues that a ban on competitive bidding is necessary to prevent deception and poor execution. Defendant also challenges the relief granted by the district court as overbroad and violative of defendant's First Amendment rights.

## A.

We hold that the district court's findings of fact were not clearly erroneous. We

c. He shall not solicit or submit engineering proposals on the basis of competitive bidding. Competitive bidding for professional engineering services is defined as the formal or informal submission, or receipt, of verbal or written estimates of cost or proposals in terms of dollars, man days of work required, percentage of construction cost, or any other measure of compensation whereby the prospective client may compare engineering services on a price basis prior to the time that one engineer, or one engineering organization, has been selected for negotiations. The disclosure of recommended fee schedules prepared by various engineering societies is not considered to constitute competitive bidding. An Engineer requested to submit a fee proposal or bid prior to the selection of an engineer or firm subject to the negotiation of a satisfactory contract, shall attempt to have the procedure changed to conform to ethical practices, but if not successful he shall withdraw from consideration for the proposed work. These principles shall be applied by the Engineer in obtaining the services of other professionals (F. 26, 389 F.Supp. 1193 at 1205).

2. 15 U.S.C. § 29 (1970). The Statute was amended on December 21, 1974 to provide for initial review in the courts of appeals in most cases. 15 U.S.C. § 29(a) (Supp. V 1975).

affirm and approve the district court's ultimate conclusion of law. We are in agreement with most of the legal reasoning of the district court, and have identified critical passages in the margin.[3]

Price is the "central nervous system of the economy," *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226 n.59, 60 S.Ct. 811, 845, 84 L.Ed. 1129 (1940). Defendant's prohibition of competitive bidding, by blocking the free flow of price information, strikes at the functioning of the free market.

The Society may not have engaged in direct price fixing as such, but its prohibition of free price competition is not far removed, in both legal and practical consequence.

Society counsel urges that the district court erred in applying a *"per se"* rule and

---

**3.** Section 11(c) prohibits defendant's members from engaging in any form of price competition when offering their services; selection is restricted to considerations of reputation and ability. No fee information may be given a prospective client which takes the form of cost estimates or other proposals in terms of dollars, man days of work required, or percentage of construction cost which can be compared to that of another engineer. Section 11(c), however, does permit members to disclose recommended state society fee schedules to prospective clients in the course of the selection process. Moreover, Sec. 9(b) of defendant's Code of Ethics requires its members not to accept work at a fee "below the accepted standards of the profession in the area." As a result of these sections, the only price information available for input into the client's selection equation is a uniformly regular fee schedule. (Footnotes omitted.)
J.A. 9939–40, 389 F.Supp. at 1200.

\* \* \* \* \* \*

Upon careful review of the pertinent authorities, the Court is convinced that the ethical prohibition against competitive bidding is on its face a tampering with the price structure of engineering fees in violation of § 1 of the Sherman Act. It is not important to know what effect the Sec. 11(c) prohibition has on the price of professional engineering services. *Kiefer-Stewart Co. v. Seagram & Sons*, 340 U.S. [211] at 213, 71 S.Ct. 259, 95 L.Ed. 219. What is of critical significance is that the agreement among defendant's members to refrain from competitive bidding is an agreement to restrict the free play of market forces from determining price; to sacrifice freedom in pricing decisions to market stability.
J.A. 9941, 389 F.Supp. at 1200.

\* \* \* \* \* \*

By proscribing competitive bidding, Sec. 11(c) has as its purpose and effect the excision of price considerations from the competitive arena of engineering services. The ban narrows competition to factors based on reputation, ability, and a fixed range of uniform prices. The prospective client is thus forced to make his selection without all relevant market information. The Sec. 11(c) ban on competitive bidding is in every respect a classic example of price-fixing in violation of § 1 of the Sherman Act.
J.A. 9941, 389 F.Supp. at 1200.

\* \* \* \* \* \*

In determining that the fee schedule in *Goldfarb* constituted a price fixing practice, the Court emphasized the nature of the restraint, the enforcement mechanism, and the fee schedule's adverse impact upon consumers. Defendant NSPE's ban on competitive bidding, like the minimum fee schedule, is not an advisory measure. It is an absolute prohibition on price competition among defendant's members and requires immediate withdrawal should a client insist upon fee proposals or open bidding. *See* 389 F.Supp. at 1195 at n.1 (text of Section 11(c) of NSPE Code of Ethics). The ban clearly impedes the ordinary give and take of the market place and operates "on its face [as] a tampering with the price structure of engineering fees." *Id.* at 1200.

Enforcement of Section 11(c) of the NSPE Code is actively promoted through publications, personal letters, case opinions by defendant's Board of Ethical Review, and state society investigations into alleged misconduct. Conformity with the provision apparently has been achieved as the record reveals no significant resistance by NSPE members to the bidding ban. *Id.* at 1196; *see generally id.* at 1205–08, FFP 27–43. Since engineering services are indispensable to almost any construction project and since alternative sources (e.g., non-licensed professional engineers) are non-existent, the impact upon the public of defendant's pricing restraint is plain. Without the ability to utilize and compare prices in selecting engineering services, the consumer is prevented from making an informed, intelligent choice. *See, e.g., id.* at 1210–11, FFP 56–61; *see also Goldfarb, supra,* 421 U.S. at 785, 95 S.Ct. 2004. The Court therefore finds that the combined character, enforcement, and effort of NSPE's bidding ban constitute a classic illustration of price fixing under *Goldfarb.*
J.A. 9987–88, 404 F.Supp. at 460 (on remand).

that the latest decisions of the Supreme Court require a more individual probing of the practice assailed, in the particular factual context. This is a false trail. To some extent, a rule that operates to prevent price competition stands at least presumptively condemned in a way that does not apply to other kinds of trade practice rules.

On its face the Society rule before us had a universal sweep, prohibiting all price competition, and on its face the rule is presumptively condemned. The district court did not take the rule solely on its face, and reach a condemnatory result merely because of an unfortunate use of language. It assessed the rule by taking into account how it had operated in fact, and with what practical anti-competitive consequences.

■ The Society is vexed because the district court did not make findings on its massive evidence, including its 17 expert witnesses, filling the bulk of a joint appendix of 10,000 pages. There was no need for the district court to embark on protracted findings on matters that it considered, in the last analysis, to be unavailing as a defense. Sound antitrust doctrine did not require a simulation of a "cost-benefit ratio" analysis, or a "balancing" of the benefits accruing from competitive restraints of this nature.

### B.

■ We interject here to respond to the contention of counsel for the Society this is not a matter for independent analysis of sound antitrust doctrine, and that the case is controlled by the Supreme Court's action on this very case in the wake of its *Goldfarb* ruling. The contention is that because

this case was not affirmed by the Supreme Court on its prior visit, but was remanded for further consideration in the light of *Goldfarb,* the total implication was that the decree should be reversed. We see no warrant for this speculative reconstruction. The Supreme Court had just decided *Goldfarb;* instead of taking the time to engage in a detailed study of cases involving closely related issues, it requested the district court to do so. The district court did so, and it concluded that although Goldfarb was not a square holding absolutely in point its major thrust was in accord with the district court's decree. We think this was a sound discernment of *Goldfarb* and its radiations.

### C.

■ We do not say or imply that there is no room in antitrust law for ethical rules of practice for the learned professions, to prevent harm to the lay consumer and general public. What we do say is that the rationalization offered by the Society does not justify the broad ban on all competitive bidding which the Society has attempted to enforce.[4] Section 11(c) has been stolidly applied as a block governing any and all engineering services associated with the study, design, and construction of real property improvements. It does not take into account the sophistication of the purchaser, the complexity of the project, or the procedures for evaluating price information. It forbids the premature disclosure of all types of fee information—including cost estimates based on man-days of work and percentage of construction cost. The only exception to its broad prohibition concerns fee schedules recommended by the state society.

---

4. We find largely irrelevant, in deciding the issue before us, opinions dealing with the legality of prohibitions on the advertising of professional fees. *Consumers Union v. American Bar Association,* 427 F.Supp. 506 (E.D.Va.1976) (three judge court); *Bates v. Arizona State Bar,* 113 Ariz. 394, 553 P.2d 640 (1976), *prob. juris. noted,* 429 U.S. 813, 97 S.Ct. 53, 50 L.Ed.2d 73 (1976). Apart from potential distinctions between professions, there is an enormous difference between advertising fee information to the general public and responding to a request for an estimate or bid on a particular job. Fee

information thrust at the public is more likely to reach individuals unable to evaluate its significance. In addition, the professional who advertises his fee is generally publicizing a price for a project whose nature is not yet known to him. In contrast, the professional who responds to a request for a bid has a better grasp of the specific task before him and a better opportunity to take into account the sophistication of the potential purchaser. Thus we see no correlation between these two issues.

The full thrust of the defendant's prohibition is sharply etched in the findings of the district court. The district court found that in 1970, the Department of Defense attempted to test a new procedure for the selection of architectural-engineering firms which would include an element of price competition. Under this procedure, pre-qualified engineering firms were invited to submit two sealed envelopes separately containing a technical proposal and a non-binding price estimate. The technical proposals were to be opened and evaluated by a selection board on the basis of their technical competence. Then the envelopes containing the price estimates were to be opened and a determination made as to whether price considerations warranted a change in the ratings of the proposals. The test procedure was to be conducted for a period of only one year, and in only two military construction districts. Despite the relative sophistication of the purchaser, the extensive provision for consideration of factors other than price, and the limited nature of this experiment, the Society advised its members that the DOD test procedure was unethical and urged them not to submit price information. As a result, the Department of Defense was unable to obtain price proposals under the test procedure.

■ The Society's opposition to the Defense Department's cautious and well conceived experiment is symbolic of the implacability of the Society's campaign to prohibit competitive bidding. Because of the breadth of 11(c) on its face and as enforced, the district court was fully justified in granting the broad injunctive relief. Counsel for the Society puts it that the Society is willing to work out a more refined decree, one more limited in its objectives and restraints. The situation might be different if the Society had taken the initiative along these lines, rather than a kind of all-out

resistance to the lawsuit on the ground that its rules were necessary at the very core for sound regulation. The case as it stands presents a Society whose program has been one of all-out interdiction of price information for the client who has not selected its engineer, and this warrants a firm remedial decree. If the Society wishes to adopt some other ethical guideline more closely confined to the legitimate objective of preventing deceptively low bids, it may move the district court for modification of the decree.

### D.

■ It is in light of the foregoing analysis that we approve the approach taken by the district court, its comment that the Rule is classic price-fixing, and hence illegal "per se," while adding a word of refinement of analysis. A combination "formed for the purpose and with the effect" of fixing or stabilizing prices is illegal *per se. United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at 223, 60 S.Ct. 811; *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951). This formulation of doctrine began in *United States v. Trenton Potteries,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 71 L.Ed. 700 (1927), and reached full expression in *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), in which the Court explained that price fixing is one of a group of restraints conclusively deemed unreasonable, devoid of any "redeeming virtue" that the law need take into account and measure in the scales. *Id.* at 5, 78 S.Ct. 514. There is a co-existing doctrine that, in limited contexts, permits a business group to adopt a rule or practice that is narrowly defined in terms of intended social benefits notwithstanding potential effect on price, but these limited contexts are inapplicable here.[5]

---

5. For example, in *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), the effect on price was only a temporary hold, governing only a small part of total transactions, put into effect by a board of trade representing and regulating both buyers and sellers.

The doctrine permitting some trade association reporting, which originated in *Maple Flooring Mfrs. Assn. v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925), increased the amount of economic information available and thereby facilitated the rational decision-making necessary for effective compe-

That co-existing doctrine may come to have application to ethical rules of professional associations narrowly confined to interdiction of abuses,[6] a problem we need not explore in view of the quite different context of this case.

■ In this case what is presented is a rule that is sought to be justified in terms of avoiding dangers to society, but which has been both written and applied in practice as an absolute ban (affecting prices) that governs situations where there are no such dangers. In that context, the absolute rule is fairly identified as a price-sustaining mechanism. The issue is not one of mere semantics, it is one of accurate identification or classification of a rule having regard to its language, purpose and effect. The district court correctly appraised the rule before it as one that at its core "tampers with the price structure,"[7] and as therefore illegal without regard to claimed or possible benefits.

### E.

■ In view of the foregoing, we affirm the district court's decree, except in one respect in which we think the decree is overbroad: It not only enjoins the Society from adopting any policy statement which describes price competition as "unethical," but also orders the Society to state affirmatively that it does not consider competitive bidding to be unethical. To force an association of individuals to express as its own opinion judicially dictated ideas is to encroach on that sphere of free thought and expression protected by the First Amendment. Any such regulation by the state should not be more intrusive than necessary to achieve fulfillment of the governmental interest. The decree provision commanding the Society to state that in its view certain

tition. Further, the nature of the information exchanged, and the absence of any agreement to compel adherence to particular prices, made it highly unlikely that any anti-competitive abuse could occur.

practices were not unethical goes beyond this. *Cf. National Labor Relations Board v. Teamsters and Chauffeurs Union*, 241 F.2d 428 (7th Cir. 1957); *Edward G. Budd Manufacturing Co. v. National Labor Relations Board*, 142 F.2d 922, 926 (3d Cir. 1944) (company could be required to post notices, but not to forgo expressing its opinions on labor matters). *Compare International Union of Elect'l, Radio and Machine Workers v. NLRB*, 127 U.S.App.D.C. 303, 383 F.2d 230 (1967), *cert. denied*, 390 U.S. 904, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968). Certainly the harm wrought by the prior statements that the practices were unethical requires corrective action, but we are inclined to the view that the purposes of the Sherman Act would be fully served by a decree forbidding the Society from future expression that the price practice is unethical, and requiring it to publish an advice that its prior ruling has been rescinded in light of the court's decree that it was an unlawful interference with a legal right of the engineer, protected under the antitrust laws, to provide price information to a prospective client in advance of retainer.

The case is remanded with instructions to modify the decree in part; otherwise, the judgment is affirmed.

*So ordered.*

**6.** *See generally Goldfarb v. Virginia State Bar*, 421 U.S. 773, 787–88 n.17, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

**7.** *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).