**SURETY TITLE INSURANCE AGENCY, INC., Plaintiff,**

v.

**VIRGINIA STATE BAR, Defendant.**

**Civ. A. No. 76–0180–R.**

United States District Court, E. D. Virginia, Richmond Division.

April 25, 1977.

Stephen W. Bricker, Richmond, Va., Alan B. Morrison, Public Citizen Litigation Group, Robert B. Hummel, Washington, D. C., for plaintiff.

John Hardin Young, Stuart H. Dunn, Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, Surety Title Insurance Agency, Inc. (Surety), brings this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, to redress injuries to its business allegedly incurred by virtue of actions of the defendant, Virginia State Bar. Plaintiff seeks monetary, injunctive and declaratory relief. Jurisdiction is attained pursuant to 15 U.S.C. §§ 15 and 26 and 28 U.S.C. § 1337. The matter comes before the Court on cross-motions for summary judgment as to liability. The issues have been briefed and argued by counsel, and the matter is ripe for disposition.

■ The gist of the plaintiff's complaint is an allegation that the defendant's practice of issuing advisory opinions relating to ethics and the unauthorized practice of law, coupled with the threat of disciplinary pro-

ceedings,[1] illegally restrain commerce in the area of title insurance. Specifically, the plaintiff maintains that the defendant's actions constitute an illegal group boycott and an attempt to monopolize in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiff does not challenge either the definition of the practice of law as enunciated by the Supreme Court of Virginia nor the correctness of any particular ethical or unauthorized practice of law opinion.[2] Rather, it is the method by which these opinions are issued that is alleged to be in violation of the federal antitrust laws.[3] A description of the opinion issuing process as it relates to title insurance is appropriate to provide the factual predicate for the Court's conclusions.

The Supreme Court of Virginia is legislatively empowered to define what constitutes the practice of law. Va.Code Ann. § 54–48(a) (Repl.Vol.1974). Pursuant to this statute and its inherent authority, the Supreme Court of Virginia in 1938 defined the practice of law, in pertinent part, as follows:

"Generally, the relation of attorney and client exists, and one is deemed to be practicing law, whenever he furnishes to another advice or service under circumstances which imply his possession and use of legal knowledge or skill.

Specifically, the relation of attorney and client exists, and one is deemed to be practicing law, whenever—

(1) One undertakes for compensation, direct or indirect, to advise another, not his regular employer, in any matter involving the application of legal principles to facts or purposes or desires.

(2) One, other than as a regular employee acting for his employer, undertakes, with or without compensation, to prepare for another legal instruments of any character, other than notices or contracts incident to the regular course of conducting a licensed business. . . ."

Rules of the Supreme Court of Virginia, Part Six, Rule 6:I, 216 Va. 1062 (1976). This definition was first drafted by a special subcommittee of attorneys. The Supreme Court ordered release of the proposed definition and solicited public comments. These comments brought about one addition to the proposed definition. The definition as adopted in 1938 remains unchanged today.

The Supreme Court was also authorized to create the Virginia State Bar "to act as an administrative agency of the Court for the purpose of investigating and reporting the violation of such rules and regulations as are adopted by the Court under the article for such proceedings as may be necessary." Va.Code Ann. § 54–49 (1974 Repl. Vol.) The defendant, Virginia State Bar (State Bar), was created pursuant to this authority by the Rules of the Supreme Court of Virginia (Rules of the Court) in 1938. Each attorney practicing law in Virginia is required by statute and the Rules of the Court to be a member of the State Bar. Va.Code Ann. § 54–49 (1974 Repl.Vol.); Rules of the Supreme Court of Virginia,

---

1. Rules of the Supreme Court of Virginia, Part Six, Rule 6:II, DR 3–101(A) subjects attorneys to disciplinary action should they "aid a non-lawyer in the unauthorized practice of law." 216 Va. 1090 (1976).

2. Subsequent to the filing of this action, the Attorney General of Virginia filed a Bill of Complaint against the plaintiff charging it with the unauthorized practice of law. The Bill and subpoena issued by the Clerk of the Circuit Court of Virginia Beach were served on the plaintiff on December 16, 1976. A challenge to the substance of the State Bar's opinions on the unauthorized practice of law as they relate to title insurance may be expected in the state court proceeding.

3. Thus, there is no question of state law presented in this case which would call for the invocation of the exceptional doctrine of abstention. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Moreover, resolution of the issues presented in this case would not interfere with the action brought by the Attorney General of Virginia against the plaintiff. The two actions simply present different issues. Thus, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny are not applicable. *See Consumers Union of United States, Inc. v. American Bar Ass'n*, 427 F.Supp. 506, 513–515 (E.D.Va.1976).

Part Six, Rule 6:IV, ¶ 2, 216 Va. 1141 (1976). The powers of the State Bar have been delegated by the Supreme Court of Virginia to a Council comprised of at least one attorney elected from each judicial circuit in Virginia and six attorneys appointed at large by the Supreme Court of Virginia. The current President, President-elect, and immediate past President of the State Bar serve as *ex officio* members of the Council. Rules of the Supreme Court of Virginia, Part Six, Rule 6:IV, ¶ 5, 216 Va. 1143 (1976). The Council currently consists of fifty-six elected or appointed members and the three *ex officio* members.

When the Virginia Supreme Court established the State Bar, it also promulgated rules governing the Bar's organization and government as well as those relating to the Council. Among the various powers vested in the Council is the power to render advisory opinions. Rules of the Supreme Court of Virginia, Part Six, Rule 6:IV, ¶ 9(i), 216 Va. 1146 (1976). Any active member of the State Bar may solicit an advisory opinion "on any question of contemplated professional conduct of such member, and upon such application the Council, or a Committee of the Council appointed for the purpose, shall render such an opinion. In the event the opinion is rendered by a Committee, such member shall have the right of appeal to the Council." Rules of the Supreme Court of Virginia, Part Six, Rule 6:IV, ¶ 10, 216 Va. 1147 (1976). The by-laws of the Council establish five-member committees, appointed by the President from its membership, for both Legal Ethics and Unauthorized Practice of Law. Rules of the Supreme Court of Virginia, Part Six, Rule 6:V, Art. VIII and IX, 216 Va. 1173–1174 (1976).

The advisory opinions are not rendered in an adjudicative or adversarial context. The advisory opinions relating to the unauthor-

ized practice of law are deemed to be of general application. Accordingly, the State Attorney General has advised State Bar members that the Virginia Conflict of Interest Act, Va.Code Ann. § 2.1–352, does not preclude a practicing attorney from voting with respect to an advisory opinion concerning the unauthorized practice of law.[4] Opinion of the Attorney General of the State of Virginia (July 24, 1974). There is also no provision made for review by any Court of the Unauthorized Practice of Law opinions. An amendment to the rules governing the State Bar to allow for judicial review of advisory opinions was proposed, but rejected by the State Bar in 1938. Accordingly, no opinion of the Ethics Committee or the Unauthorized Practice of Law Committee has ever been presented to or approved by the Supreme Court of Virginia. In short, advisory opinions are issued by lawyers in response to questions submitted by lawyers and no provision is made to inject the participation of non-interested parties into the process.

The area of unauthorized practice of law pertinent to the instant litigation relates to the activities of title insurance companies such as the plaintiff. In 1942, the Unauthorized Practice of Law Committee issued its opinion No. 17 in response to the following inquiry:

> "Should definition [sic] of practice of law be changed so that title companies should certify the validity of real estate and personal property titles?"

The opinion, adopted by the Council, recommended that the definition of the practice of law not be amended so as to allow title insurance companies to certify titles. This opinion is premised upon the belief that the certification of a title constitutes the practice of law within the meaning of the definition articulated by the Supreme Court of Virginia. The absence of an attorney-client

---

**4.** Thus, Council members who engage either in a real estate oriented practice or represent title companies were permitted to pass on the question of whether issuing title insurance constitutes the practice of law. As discussed *infra*, this issue can be of considerable economic concern to both the attorneys and their clients.

The only disqualification that was mandated by the Council was that of Council member Edward R. Parker who had formerly represented the Northern Virginia Lawyers Association in the proceedings which led to the issuance of UPL opinions 43 and 44, which are central to this case. See note 5, *infra*.

relationship between the company and a prospective purchaser of title insurance was viewed to be a source of potential abuse which greatly outweighed the possible benefits accruing to the public should title insurance companies be permitted to certify titles.

The Committee considered the problems associated with title insurance companies again in 1973. This consideration stimulated much debate[5] within the profession and resulted in the issuance by the Committee of two opinions which were adopted by the Council. Unauthorized Practice of Law Opinion 43 states that a title company would be engaging in the unauthorized practice of law should it issue a title insurance policy to a non-lawyer based upon a title examination conducted by lay employees of the company. This conclusion rests upon the proposition that issuing title insurance constitutes the rendering of a legal opinion as to the sufficiency of a title and is taken to be such by a lay person. The underlying proposition was deemed to be unaffected by the title insurance company's disclaimer, to be issued with each commitment, policy or binder, to the effect that:

THIS IS A TITLE INSURANCE (COMMITMENT) (POLICY) (BINDER) AND IS NOT A TITLE OPINION. THERE MAY BE MATTERS OF RECORD OR NOT OF RECORD WHICH AFFECT THE PROPERTY DESCRIBED IN SCHEDULE A, WHICH ARE NOT LISTED IN SCHEDULE B, AND WHICH THE COMPANY HAS DETERMINED TO ACCEPT AS AN UNDERWRITING RISK.

The proposed practice, falling within the Virginia Supreme Court's general definition of the practice of law coupled with the absence of an attorney-client relationship and accompanying ethical protections was deemed to present an unacceptable risk to the unwary consumer. Unauthorized Practice of Law Opinion 44 holds that upon the request of an attorney, a title insurance company may search a title and furnish such title information to the attorney and issue a commitment, or binder to insure, to whomever the requesting attorney may designate. The presence of an attorney in the transaction, so that opinion holds, "eliminates the evils against which the proscription is directed: reliance by layman upon services which are implicitly offered to him as the product of legal knowledge or skill." Related to Opinion 44 was Ethics Opinion 177 which outlines an attorney's responsibility in situations arising under Opinion 44. The Unauthorized Practice of Law Opinion 46 was also adopted at the same time. That opinion approves of title companies providing the results of their title searches directly to customers with staff counsel who request the information. The Unauthorized Practice of Law Opinions 44 and 46 as well as the Ethics Committee Opinion 177 became effective on January 25, 1975.

The plaintiff was organized in November of 1975 in order to act as an agent on behalf of out-of-state companies selling title insurance directly to home buyers. The plaintiff operates its business largely within the Tidewater area of Virginia. The plaintiff proposes to lower the cost of title insurance by eliminating the services of an attorney in a transaction between the purchaser of such insurance and the title insurance company. The purchaser of title insurance would deal directly with the plaintiff and would be able to look only to the plaintiff if there were a defect in the title. The plain-

---

5. A title insurance company proposed to provide title binders (commitments to insure) to attorneys for a set fee on the basis of title searches and abstracts conducted by the title company's employees. After reviewing the abstract, the attorney could then certify the title to the title insurance company and the home buyer and the company would issue commitment to insure. This proposal was opposed by the Northern Virginia Lawyers Association. The contending forces presented the issues to the UPL Committee which proposed UPL opinion 41. The Council held an open meeting on proposed UPL 41 on October 26, 1973, at which time it was decided that the opinion should be broken down into two opinions which subsequently became UPL 43 and 44. Opinions 43 and 44 were adopted June 20, 1974. The latter opinion was not made effective until the adoption of Ethics Opinion 177 which, along with UPL Opinion 46 was adopted January 24, 1975.

tiff currently utilizes attorneys in conducting title searches, but admittedly plans to utilize trained lay personnel should it prevail in this action. It is uncontroverted that the plaintiff's business approach would result in the consumer receiving greater services than presently offered at a substantially lower cost. For example, the affidavits and exhibits filed in this cause indicate that the consumer could save as much as $211.00 on the charges typically made in the Tidewater area for title insurance on a $30,000 home. The contemplated savings for such insurance on a $60,000 and $100,-000 home are stated to be $491.00 and $871.00, respectively. It is further represented that additional services such as surveying the tract would be included in the insurance package.

In regard to the instant controversy, there are two essential elements involved in the transfer of real estate. First, a deed must be prepared. The Supreme Court of Virginia has held that only an attorney may prepare this document. *Commonwealth v. Jones & Robins*, 186 Va. 30, 41 S.E.2d 720 (1941). The plaintiff has no quarrel with that decision. Secondly, title insurance is generally required by a lender as a condition of the loan obtained whenever financing is necessary. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773, 784, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). The plaintiff proposes to sell title insurance directly to the consumer and thereby exclude the attorney and, concomitant therewith, the attorney's fee, from the insurance transaction. The advisory opinions issued by the defendant state that this exclusion of the lawyer places the transaction in contravention of the prohibition against the unauthorized practice of law. Unauthorized Practice of Law, Opinion No. 17, August 5, 1942; Unauthorized Practice of Law, Opinion No. 43,

June 20, 1975. The Supreme Court of Virginia, however, has not yet expressed its view on the subject. The defendant's opinions, nonetheless, raise the powerful specter of disciplinary action to any attorney who participates in a real estate transaction wherein the title insurance is obtained without the services of a lawyer. *See Goldfarb, supra*, 421 U.S. at 791 n.21, 95 S.Ct. 2004. The net effect, predictably, is that attorneys, who are essential to the plaintiff's business, refuse to prepare deeds in transactions where the plaintiff provides the title insurance under its proposed method of doing business. Indeed, only ten of the approximately two hundred to three hundred attorneys contacted by the plaintiff expressed any interest in performing services for it.

▉ To paraphrase *Goldfarb*, a more classic illustration of a group boycott is difficult to conjure. *See United States v. General Motors Corp.*, 384 U.S. 127, 145–46, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Silver v. New York Stock Exchange*, 373 U.S. 341, 347, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Radiant Burners v. Peoples Gas Co.*, 364 U.S. 656, 659, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 211, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Associated Press v. United States*, 326 U.S. 1, 12–14, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). The opinion issuing process has also resulted in the attempted extension of a monopoly from an area sanctioned by the Supreme Court of Virginia (drafting titles) to an area which that Court has yet to address (title insurance). There is, moreover, no question but that the transfer of real estate in Virginia involves and substantially affects the flow of commerce between the states.[6] *See Goldfarb,*

---

**6.** In addition to plaintiff, there are numerous other agencies/title insurance companies doing business in the Tidewater area. Of the three largest companies, two are headquartered outside of Virginia (Chicago Title Insurance Company and Pioneer Title Insurance Company), and the net proceeds from all sales of those two companies are transmitted to their head-

quarters outside of Virginia. None of the other title insurance agencies or title insurance companies offers packages of services similar to those of plaintiff.

During the calendar year 1975, the United States Department of Housing and Urban Development, which is headquartered in Washington, D. C., acting pursuant to 12 U.S.C.

*supra,* 421 U.S. at 783–85, 95 S.Ct. 2004. There is similarly no disputing that the defendant's issuance of Unauthorized Practice of Law opinions has had an anticompetitive effect, if not purpose.[7] Accordingly, the Court is satisfied that the conduct in issue, if accomplished by a wholly private enterprise, would violate both Sections 1 and 2 of the Sherman Act.[8]

The defendant contends that it is exempt from federal antitrust laws under the doctrine set out in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).[9] In *Parker v. Brown,* state officials were held to be immune from liability under the federal antitrust laws for activity which would have constituted a violation of those laws had it been the product of private action. At issue in *Parker* was a legislatively mandated marketing program whose purpose was to restrain price competition in the raisin industry.

The Supreme Court explicated the *Parker* doctrine in two recent cases. In *Goldfarb v. Virginia State Bar, supra,* the Court found a minimum fee schedule maintained by the State and local bar associations and enforced through the prospects of disciplinary action and professional norms to constitute a classic illustration of price fixing. In rejecting the state action immunity asserted by the defendants, the Court noted

"[T]he *threshold inquiry* in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is *required* by the State acting as sovereign . . . Here we need not inquire further into the state action question because it cannot fairly be said that the

§ 1706c, insured the mortgages on 1,342 single family homes in the Tidewater area in the amount of $32,769,650. In fiscal year 1976, acting pursuant to 38 U.S.C. § 1810, the United States Veterans Administration, which is also headquartered in Washington, D. C., guaranteed loans on 5,410 homes in the Tidewater area in the amount of $179,952,858. Most of the homes for which plaintiff has written title insurance have been homes on which there was either a Veterans Administration guarantee or insurance from the Housing and Urban Development Department. In Virginia, as elsewhere, title insurance is generally required by lenders in order to obtain a loan for the purchase of a home.

7. The Court, at this juncture, is not in a position to reach any conclusion with regard to the intent of the defendant. There are sufficient indications in the record, however, to question whether the UPL opinions concerning title insurance were based entirely on considerations of public interest. UPL Opinion 17 decries title insurance companies of "depriving the resident attorneys of a large volume of such practice in which they would otherwise be employed." Briefs submitted by the Northern Virginia Lawyers Association in connection with UPL Opinions 41, 43 and 44 warned of title insurance companies placing in jeopardy the position of the attorney in real estate transactions. In considering UPL Opinion 41, a Council member stated "[N]o one has to tell us what it feels like to have one's practice threatened by this type of thing." The opposition to title insurance companies issuing policies without the services of an independent lawyer was characterized by another as a concern over taking "bread out of our mouths." Council Meeting of the Virginia State Bar, In Re: UPL Opinion Number 41, pp. 10, 16 (October 26, 1973).

8. Group boycotts are said to be *per se* violations of the Sherman Act. *Silver v. New York, supra,* 373 U.S. at 347, 83 S.Ct. 1246, and cases cited therein. There is a split of authority as to whether the *per se* or rule of reason test should be applied to substantive antitrust claims involving the practices of professions. *Compare United States v. National Society of Professional Engineers,* 555 F.2d 978, No. 76–1023 (D.C. Cir.1977) *with Feminist Women's Health Center, Inc. v. Mohammad,* 415 F.Supp. 1258, 1263 (N.D.Fla.1976). The Court need not reach this precise issue as it concludes that the practice in question can not withstand the less demanding rule of reason and analysis.

9. The *Parker* doctrine is frequently articulated in terms of being an "exemption" from the antitrust laws. *See, e. g., Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 780, 95 S.Ct. 2004. The doctrine, however, is founded on the concept that the Sherman Act was never intended to apply to all state action in the first instance. *See* Handler, The Current Attack on the *Parker v. Brown* State Action Doctrine, 76 Col.L.Rev. 1, 9 (1976). It is also clear that the doctrine predates *Parker v. Brown. See Olsen v. Smith,* 195 U.S. 332, 344–45, 25 S.Ct. 52, 49 L.Ed. 224 (1904). The Court, for the purposes of consistency, adopts the terminology utilized by the *Goldfarb* Court.

State of Virginia through its Supreme Court Rules *required* the anticompetitive activities of either respondent . . . It is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be *compelled* by direction of the State acting as a sovereign." *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 790–791, 95 S.Ct. at 2015 (citations omitted and emphasis added).

The most recent Supreme Court pronouncement in this area was in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). In *Cantor,* the defendant utility provided light bulbs to its customers and included the costs of same in its operating costs. As a result of this practice, the rates approved by the Michigan Public Service Commission reflected the costs of the light bulbs. The practice was both approved by and unalterable without the consent of the Michigan State Public Service Commission. This Commission was legislatively empowered to regulate the distribution of electricity. Six Justices concurred to the effect that the state action exemption from the antitrust laws was inapplicable. A plurality of four Justices rested this holding on the fact that the practice was wholly, or at least predominantly, private conduct initiated by a non-public entity. Mr. Chief Justice Burger concurred in part, preferring to base the decision solely on the absence of a state policy governing the distribution of light bulbs. Mr. Justice Blackmun concurred in the judgment on the grounds that the anticompetitive harms of the practice outweighed its benefits.

**10.** That footnote reads:

The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be

The precise scope of the state action exemption is not entirely clear. It does appear that *Goldfarb* and *Cantor* narrow the applicability of the *Parker*-doctrine from what was once viewed as its parameters. *See, e. g., Litton Systems, Inc. v. Southwestern Bell Telephone, Inc.,* 539 F.2d 418, 423 (5th Cir. 1976). The Court's footnote 17 in *Goldfarb* also indicates that practices of professions are not to be viewed in precisely the same manner as the practices of other business activities. *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 787 n.17, 95 S.Ct. at 2013.[10] Just how the antitrust laws apply to the regulation of professions is an evolving area of law.

The Fifth Circuit Court of Appeals reasons that the exemption applies only when the anticompetitive restraint in issue lies within the intent of the authorizing mandate of the State. *City of Lafayette v. Louisiana Power & Light Co.,* 532 F.2d 431, 434 (5th Cir. 1976). Thus, that Court reasoned that the minimum fee schedule in *Goldfarb* would have enjoyed immunity if the Virginia Supreme Court had required the same, and such action fell within the scope of its authority to regulate the practice of law. *City of Lafayette v. Louisiana Power & Light Co., supra,* 532 F.2d at 434 fn. 7 and 8. A similar approach has been adopted by the Third Circuit Court of Appeals. *Duke & Company, Inc. v. Foerster,* 521 F.2d 1277, 1280 (3d Cir. 1975).[11]

The Ninth Circuit Court of Appeals addressed the state action exemption issue in the context of professional regulation. That Court interpreted *Cantor* and *Goldfarb* as meaning that "to survive a Sherman Act challenge a particular practice, rule, or regulation of a profession, whether rooted

viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today.

**11.** The Fourth Circuit Court of Appeals in a post-*Cantor* and *Goldfarb* case found *Parker v. Brown* to be inapplicable where the state took no action to compel the defendant to engage in the alleged illegal action. *Ballard v. Blue Shield of Southern West Virginia,* 543 F.2d 1075, at 1078–1079, (4th Cir., 1976).

in tradition or the pronouncements of its organizations, must serve the purpose for which the profession exists, *viz.* to serve the public. That is, it must contribute directly to improving service to the public. Those which only suppress competition between practitioners will fail to survive the challenge. This interpretation permits a harmonization of the ends that both the professions and the Sherman Act serve." *Boddicker v. Arizona State Dental Ass'n,* 549 F.2d 626 (9th Cir. 1977) (footnotes omitted). Recently, the District of Columbia Circuit Court of Appeals, while not ruling on the state exemption issue, intimated that anticompetitive practices of professions taking the form of ethical rules, might survive a Sherman Act challenge where such practices are "narrowly confined to interdiction of abuses." *United States v. National Society of Professional Engineers,* 555 F.2d 978 at 984, No. 76–1023 (D.C.Cir.1977).

■ From these cases, the Court cautiously discerns the following analytical principles applicable to the instant controversy. The "threshold inquiry" is whether the contested activity is *compelled* by the state acting as sovereign. *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 790, 95 S.Ct. 2004. State authorization, approval, encouragement, or participation in restrictive activity does not confer antitrust immunity. *Cantor v. Detroit Edison Co., supra,* 428 U.S. at 591, 96 S.Ct. 3110. A negative answer to this threshold question terminates the analysis and no immunity would be afforded the defendant. *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 790–791, 95 S.Ct. 2004; *Ballard v. Blue Shield of Southern West Virginia,* 543 F.2d 1075, pp. 1078–1079 (4th Cir., 1976). The use of the terms "threshold inquiry," "state action of the type the Sherman Act was not meant to proscribe", and "further inquiry" by the *Goldfarb* Court strongly suggest that an affirmative answer demands further analysis. *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 790, 95 S.Ct. 2004. *See* Robinson, Recent Antitrust Developments: 1975, 76 Col.L.Rev. 191, 212 (1976).

■ Just what further analysis is required is admittedly not entirely clear. The plurality opinion in *Cantor* in which the Chief Justice joined, states that an exemption from the antitrust laws is not available unless "that exemption was necessary in order to make the regulatory act work, 'and even then only to the minimum extent necessary.'" *Cantor v. Detroit Edison Co.,* 428 U.S. at 597, 96 S.Ct. at 3120. This approach, articulated in the context of what was deemed to be private conduct, involves a determination of whether the anticompetitive activity is necessary to accomplish the regulatory purpose of that agency. Mr. Justice Blackmun articulated a slightly different standard in his concurring opinion.

"I would apply, at least for now, a rule of reason, taking it as a general proposition that state-sanctioned anticompetitive activity must fall like any other if its potential harms outweigh its benefits. This does not mean that state-sanctioned and private activity are to be treated alike. The former is different because the fact of state sanction figures powerfully in the calculus of such harm and benefit . . . I would assess the justifications of such enactments in the same way as is done in equal protection review, and where such justifications are at all substantial (as one would expect them to be in the case of most professional licensing or fee-setting schemes, for example . . . ) I would be reluctant to find the restraint unreasonable." *Cantor v. Detroit Edison Co.,* 428 U.S. at 610, 96 S.Ct. at 3126.

The Ninth Circuit Court of Appeals phrased the analysis in terms of whether the anticompetitive activity contributes directly to improving service to the public or only to suppress competition. *Broddicker v. Arizona State Dental Ass'n, supra.* These different formulations share the common thread of focusing on the relationship between the anticompetitive activity and the state interest it purports to advance. If that relationship is tenuous, the activity must fall. *See* Slater, Antitrust and Government Action: A Formula for Narrowing *Parker v. Brown,* 69 Nw.L.Rev. 71, 104–109 (1974).

The Court is of the view that the issuance of Unauthorized Practice of Law and Ethical opinions by the defendant is compelled by the Commonwealth of Virginia. Acting pursuant to statutory [12] and inherent [13] authority, the Supreme Court of Virginia has created the State Bar and promulgated the rules and by-laws from which the Ethical and Unauthorized Practice of Law opinion processes have emerged. The State Bar, acting through its Council or the appropriate Committees is required to render, at the request of a member, advisory opinions on contemplated professional conduct. See Rules of the Supreme Court of Virginia, Part Six, Rule 6:IV, ¶ 10, Rule 6:V, Art. VIII, IX and XIII, 216 Va. at 1147, 1173–74 (1976).[14] These directives are not couched in the permissive "may," but rather are expressed in the mandatory phrase "shall render such opinion". Thus, unlike the light bulb distribution system of *Cantor* or the minimum fee schedule in *Goldfarb*, the issuance of opinions on the unauthorized practice of law is the product of the command of the state.

▮ The Court finds, nonetheless, that this practice must fall under the antitrust laws. While cognizant that the advisory opinion process enjoys the sanction of the state, the harms of the system greatly outweigh its purported benefits. The states have "a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety and other valid interests, they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 792, 95 S.Ct. at 2016. Restricting the practice of law to persons licensed by the state is both a legitimate and necessary exercise of this power. The underlying rationale behind this grant of a monopoly is twofold: (1) it insures that persons rendering legal services are qualified to do so; and (2) it subjects persons rendering such services to the Virginia Code of Professional Responsibility, Rules of the Supreme Court of Virginia, Part Six, Rule 6:II, 216 Va. 1064 (1976). *See Commonwealth v. Jones & Robins,* 186 Va. 30, 41 S.E.2d 720 (1941); *Richmond Ass'n of Credit Men v. Bar Ass'n of Richmond,* 167 Va. 327, 189 S.E. 153, 159–161 (1937); *Bryce v. Gillespie,* 160 Va. 137, 168 S.E. 653, 656 (1933). Both of these considerations serve to advance the interest of the consuming public by insuring the quality of legal services and imposing upon lawyers a degree of accountability to the state.

▮ The Unauthorized Practice of Law opinion process, as it presently operates, is not, in the Court's view, sufficiently related to those interests to justify its anticompeti-

**12.** Va.Code Ann. §§ 54–48, 54–49 (1974 Repl. Vol.).

**13.** *Button v. Day,* 204 Va. 547, 132 S.E.2d 292 (1963) cited in *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 789 n.18, 95 S.Ct. 2004.

**14.** Rule 6:IV, ¶ 10 reads as follows:
　10. Advisory Opinions.—Any active member of the Virginia State Bar may apply to the Council for an advisory opinion on any question of contemplated professional conduct of such member, and upon such application the Council, or a Committee of the Council appointed for the purpose, *shall render such opinion.* In the event the opinion is rendered by a Committee, such member shall have the right of appeal to the Council. (Emphasis added). 216 Va. 1147 (1976).
　Rule 6:V, Art. IX reads as follows:
ARTICLE IX
　Committee on Unauthorized Practice of the Law

A Standing Committee of five members of the Council, to be appointed by the President and to be known as the Committee on the Unauthorized Practice of the Law, is hereby created. All powers and duties of the Council with respect to the unauthorized practice of law, not otherwise delegated or reserved, *shall* be exercised and discharged by the Committee. (Emphasis added). 216 Va. 1173 (1976).
　Rule 6:V, Art. XIII reads as follows:
ARTICLE XIII
　All committees, District or Standing, shall refer to the standing committees on Professional Ethics, Unauthorized Practice of the Law, and Judicial Ethics, such questions arising before them as are appropriate for opinion by the respective committees, and such committees *shall render advisory opinion* upon which the Committee asking same shall act. (Emphasis added). 216 Va. 1179 (1976).

tive effects. Criminal sanctions are available to deter and punish laymen who might engage or have engaged in the unauthorized practice of law. Va.Code Ann. § 54–44.[15] The advisory opinion process, moreover, cannot reasonably be said to deter those from whom the public may need protection as only licensed attorneys may obtain these opinions. The layman contemplating conduct which might constitute the practice of law, and hence from whom the public needs protection, has no access to the defendant's advisory opinion process. Thus, it would appear that the persons who the State desires to deter and who have the greatest need for advisory opinions are excluded from the process presently under attack. It may be argued that the disciplinary rule pertaining to aiding the unauthorized practice of law[16] generates a need for advisory opinions. The irony of this argument is manifest. One facet of the practice of law is advising clients as to the legality of a proposed course of conduct. Thus, lawyers are reputed to possess special expertise in interpreting statutes and judicial decisions and applying the distilled principles of law to future actions. Attorneys as a class, therefore, should be the last segment of society in need of advisory opinions pertaining to the Virginia Supreme court's definition of the practice of law. To contend that attorneys require these advisory opinions is to deny the very expertise which serves as partial justification for placing restrictions on who may practice law.

The Unauthorized Practice of Law opinion process places attorneys in the unique position of being able to define the extent of their own monopoly. It belabors the obvious to point out that lawyers in general would financially benefit from an expansive definition of the practice of law. The danger is crystalized under the facts of the instant case.[17] An attorney engaged in a real estate oriented practice stands to lose substantial fees should the issuance of title insurance be held to lie outside the parameters of the Virginia Supreme Court's definition of the practice of law. This direct pecuniary interest highlights the infirmity of the system as it now operates. *Gibson v. Berryhill*, 411 U.S. 564, 578–579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). The absence of judicial participation aggravates the anticompetitiveness of the Unauthorized Practice of Law opinion process. The State Bar rules make no provision for court review of such opinions. All of the opinions issued to date have become effective without the consideration or approval of the Supreme Court of Virginia. Thus, that organ of the State vested with responsibility for defining the practice of law has yet to intimate its authoritative views on the title insurance issue.

There is nothing in the instant record, moreover, that indicates that either the legislature or the Supreme Court of Virginia intended to restrain competition between lawyers and laymen in areas which arguably do not lie within the definition of the practice of law. The state policy behind restricting the practice of law to licensed attorneys is to protect the public and not, as was the case in *Parker v. Brown*, to financially benefit a particular segment of society. That intent is thwarted when, as here, the regulatory activity serves an anticompetitive end without necessarily improving the services rendered to the consuming public.

■ In summary, not only is the Unauthorized Practice of Law opinion process tenuously related to the state interest it purports to advance, but it operates in a decidedly anticompetitive fashion offensive to notions of basic fairness. It does not act

---

15. Additionally, the Attorney General is authorized to employ special counsel to investigate and prosecute any person engaged in the unauthorized practice of law. Va.Code Ann. § 2.1–125 (1973 Repl.Vol.).

16. Rules of the Supreme Court of Virginia, Part Six, Rule II: DR 3–101(A), 216 Va. 1090 (1976).

17. The Court's remarks here should not be taken as a comment on the merits of any particular UPL opinion or a suggestion of ethical impropriety on the part of any member of the bar. The Court is merely pointing out the anticompetitive dangers inherent in the UPL opinion process.

to advance the consumer interest, but merely that of the attorney. It is neither necessary to, nor are its anticompetitive effects reasonable in light of, the justifying state interest. Accordingly, the state action exemption is not available to the defendant.[18]

Both the plurality opinion and that of Mr. Justice Blackmun in *Cantor* indicate a defense to monetary liability may be available to a defendant based on notions of fairness. *Cantor v. Detroit Edison Co.*, 428 U.S. at 591 and 598, 96 S.Ct. 3110; *Cf. Feminist Women's Health Center, Inc. v. Mohammad*, 415 F.Supp. 1258, 1263 (N.D.Fla.1976). The Court believes that this may be an appropriate case for such a defense. The issuing of the opinion resulting in the anticompetitive activity here was required by the state. The Court will request that the parties address this issue further after the Court and counsel have the benefit of the Supreme Court's opinion in the case of *Bates v. State of Arizona* which is anticipated before the Court's current term ends in June.

An appropriate order will issue.

---

**18.** The defendant argues that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1013 exempts the regulation of title insurance from the antitrust laws. Title 15 U.S.C. § 1012 (b) grants the business of insurance a qualified exemption from the Sherman Act. This exemption is specifically limited by 15 U.S.C. § 1013(b) which provides: "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion or intimidation." The Court is satisfied that the type of boycott involved herein is the type condemned by the McCarran-Ferguson Act. *See Ballard v. Blue Shield of Southern West Virginia*, 543 F.2d 1075, p. 1078, No. 75–1982 (4th Cir., 1976).